NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WILSON FREIGHT COMPANY,
Respondent.

No. 78–1178.

United States Court of Appeals,
First Circuit.

Argued Oct. 3, 1978.

Decided Aug. 30, 1979.

Andrew F. Tranovich, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Elinor Hadley Stillman and Lee Ann Huntington, Attys., Washington, D. C., were on brief, for petitioner.

Paul J. Kingston, Boston, Mass., with whom Paul V. Mulkern, Jr., and Kingston & Garrett, Boston, Mass., were on brief, for respondent.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The National Labor Relations Board has applied for enforcement of its order against the Wilson Freight Company. The Board, summarily affirming the decision of its administrative law judge (ALJ),[1] ruled that the Company had violated §§ 8(a)(1), (3), and (4) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3), and (4),[2] by dis-

---

1. The Board affirmed "the rulings, findings, and conclusions of the [ALJ]," modified his remedy as to the computation of interest on the back-pay award, and adopted a slightly modified version of his recommended order. 234 NLRB No. 132 (Feb. 10, 1978).

2. These provide as follows:
"Sec. 158(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

.    .    .    .    .

charging an employee, Paul Smith, for concerted activity protected by the Act, and ordered, *inter alia,* that Smith be reinstated. 234 NLRB No. 132 (Feb. 10, 1978). The Company opposes enforcement on the ground that Smith was discharged for a legitimate business reason.

The Company is a motor freight carrier, one of whose terminals is in Chelmsford, Massachusetts. Drivers there are represented by Local 25 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. The discharged employee, Smith, was the shop steward at the Chelmsford terminal. During the several years prior to his discharge on September 3, 1976, Smith registered numerous complaints against his employer with governmental officials and agencies. The Board ruled these complaints were "protected" under the National Labor Relations Act and that they constituted the "real" reason for Smith's discharge. The Company's contention that Smith was discharged for interfering with an internal bidding procedure was treated as a mere pretext. In particular, the Board held that a warning letter, dated September 2, 1976, and mailed to Smith just before he was discharged, demonstrated the Company's anti-union animus. In the letter the Company had said Smith's complaints interfered with its business and were in excess of his authority as shop steward, and that further interference or conduct in excess of authority would result in his instant dismissal.

I.

A critical issue, then, is whether Smith's incessant complaints, made outside the bargaining framework, went so far beyond the functions of a shop steward, as defined in Article 41 of the collective bargaining agreement between the Company and Local 25,[3] as to justify the September 2 warning letter. The ALJ's findings say little about the scope and actual character of Smith's complaints. The ALJ seems to have regarded the complaints as "protected" whether or not Smith was acting beyond the contract limitations imposed on shop stewards. As we see the issue differently, we set out in detail the facts concerning Smith's complaint activity, relying in large part on exhibits consisting of Smith's letters and the responses he received.

Smith began complaining to outside officials in 1974, a short time after the Company had taken over a new terminal in

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .;

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this [Act]."

**3.** Article 41 of the so-called New England Supplemental Freight Agreement, to which both Local 25 and the Company were parties at relevant times, reads as follows:

"The Employer recognizes the right of the Union to designate job stewards and alternates for each terminal from the Employer's seniority list, but no more than one in each classification. *The authority of job stewards and alternates so designated by the Union shall be limited to, and shall not exceed the following duties and activities*:

"1. The investigation and presentation of grievances to his Employer, or the designated company representative in accordance with the provisions of this collective bargaining agreement;

"2.. The collection of dues when authorized by appropriate Local Union official;

"3. The transmission of such messages and information which shall originate with, and are authorized by the Local Union or its officers, provided such messages and information:

(a) have been reduced to writing, or

(b) if not reduced to writing, are of a routine nature and do not involve work stoppages, slow-downs or refusals to handle goods.

"Job stewards and alternates have no authority to take strike action, cause a slowdown or any other action interrupting the Employer's business, except as authorized by official action of the Union. The Employer recognizes these limitations upon the authority of job stewards and their alternates, and shall not hold the Union liable for any unauthorized acts. The *Employer in so recognizing such limitations shall have the authority to impose proper discipline, including discharge, in the event the shop steward has taken unauthorized strike action, or work stoppage in violation of this Agreement.* The Union reserves the right to remove the Shop Steward at any time, for the good of the Union.

"Stewards shall be granted super-seniority, for all purposes including layoff." [Emphasis supplied.]

Chelmsford, Massachusetts. The terminal manager was one Rudolph, and after a brief period of good feelings, relations between Smith and Rudolph deteriorated.

In September of 1974, signing himself as "shop steward," Smith dispatched a letter to Massachusetts Governor Sargent, complaining of inadequate heat within the terminal in purported violation of a state regulation, Industrial Bulletin No. 1, § 113. Smith wrote this letter shortly after components of the Teamsters Union and a group of Massachusetts truck owners had negotiated a state-wide agreement, known as the Industry Heat Agreement, indicating how the regulation would be applied to their circumstances. State officials approved this agreement, and it was signed on behalf of Smith's union, Local 25, by Business Agent Fred Singelais (who was also chairman of the union negotiating group). The agreement provided that there should be warm-up rooms in terminals and that employees should receive periodic heat breaks. In his letter to Governor Sargent, Smith did not accuse the Company of failing to comply with the Industry Heat Agreement, the existence of which he acknowledged, but rather complained that the agreement was illegal and improper. Smith felt that the state regulation required the provision of heat throughout the terminal, and that his union had been wrong to agree otherwise.

In his letter, Smith asked the Governor, sarcastically, if "we should pay our State Income Tax to the Teamsters." The letter concluded,

"Is the State so weak that they cannot enforce the law where Teamsters and Trucking Owners are concerned? We do not believe so, but we have been wrong before.

"We are asking your help to prove us right without involving the Federal Government.

"Respectfully Yours,
Paul A. Smith
Shop Steward"

Copies of this letter were sent to Massachusetts Attorney General Quinn and the Massachusetts Safety Commissioner.

The Governor's office responded to Smith on October 2, 1974 that the warm-up room plan negotiated between the Teamsters Union and the trucking company owners was considered to be "acceptable by both labor and management and sufficient under the law . . . . If your understanding of the law differs from that of those involved in these negotiations, it might be helpful for you to seek legal advice."

There the matter lay until March of 1975, when Smith, in another letter signed "Paul Smith, Shop Steward," wrote to the new governor, Dukakis, accusing state officials, and in particular Mr. Everett Grady of the Massachusetts Division of Industrial Safety, of either not knowing what they were talking about or else refusing to do their job and being "full of bull." Smith continued,

"I feel we have been patient enough. We are entitled to an answer. Is Section 113 of Bulletin 1 a law? If so why is it not being enforced?"

This set off a flurry of letters between representatives of the trucking industry's Employers' Group; the Director of the Massachusetts Department of Labor and Industries; and Mr. Singelais of Local 25. The question was raised why Smith had not filed a grievance with Local 25 as provided under the Industry Heat Agreement.[4] In a second letter to Governor Dukakis, dated April 24, 1975, Smith assured the Governor that "the procedure of making a formal complaint to the Union has already been done," and that he, Smith, had taken the matter up with "Pat Lee, our business agent." However, in a letter on Local 25's stationery, dated July 18, 1975, Business Agent Singelais wrote the owners' group:

"In regard to the letter . . . pertinent to the letter sent to Governor Du-

---

4. Paragraph 7 of the Agreement provided, "Heat grievances should be filed in writing with the Business Agent, dated and signed."

kakis by Paul Smith, the Steward of Wilson Freight Company, relative to the Heat Law and an alleged discussion with Business Agent Patrick Lee, I have discussed this matter with Pat, and he assures me that to date, he has not received a grievance relative to the Heat Law, nor did Mr. Smith have any discussion with Pat about this matter.

"As Co-Chairman of the Heat Committee, I am sure that I do not have to familiarize you with the procedure that has to be followed and until such time as a grievance is filed by Mr. Smith, you may consider this matter closed."

No further correspondence relative to the heat matter appears in the record.[5] We observe that the foregoing complaint to Governor Dukakis and the alleged demeaning of Mr. Grady were actions later criticized by the Company in its September 2, 1976 letter to Smith. In finding that letter indicative of anti-union animus, the ALJ did not mention that Smith's heat complaints had been directed against policies and procedures spelled out in the Industry Heat Agreement to which Local 25, Smith's union, was a signatory. Nor did the ALJ mention the complete absence of evidence that Smith's conduct was endorsed by Local 25. In crediting Smith's testimony throughout the proceeding, moreover, the ALJ did not comment upon the disparity between Smith's representations in his letter to the Governor that he had complained formally to the Union and had taken up the heat complaint with Business Agent Lee, and the flat contradiction of these representations in Business Agent Singelais' letter.[6]

Smith followed the heat complaint with a plethora of other complaints delivered over Smith's signature as "shop steward," not individually. There is no evidence that any of these complaints were made with the official approval of Local 25 or its officers. Rather they seem to have been instigated by Smith with, according to his own testimony which the ALJ credited, support from one or more persons at the Chelmsford terminal.

On April 3, 1975, Smith issued a letter headed, "This is a Warning Letter," to Rudolph, the terminal manager, complaining that local freight pick-ups and deliveries, done as a favor to customers, violated regulations of the Interstate Commerce Commission. The letter ended, "Further violations of this type cannot be tolerated." On May 16, 1975, Smith wrote to the Regional Director of the I.C.C., over his title of shop steward, stating that he wished to initiate a complaint against Wilson Freight Company and another named carrier for violating Tariff ECMCA 149J, item 501–10, by spotting trailers without power for as long as two and three days without charge. A copy

---

5. Mr. Everett L. Grady, Director of the State Division of Industrial Safety, the official responsible for enforcement of the heat regulation, in a letter of July 14, 1975, found that the Company had installed "a form of trailer truck sealing devices on their terminal doors and has provided a warming room in accordance with the agreement, but periodically certain employees of this company are filing complaints with this Division demanding heat within the terminal itself which is impractical due to 40 or more doors in the building utilized for truck unloading purposes." Mr. Grady concluded that the Company was in compliance with the agreement between the carriers and the Teamsters Union.

6. Smith conceded in testimony that all, or virtually all, of the complaints which he forwarded directly to various agencies could also have been made the subject of grievances under the contract grievance procedure. Smith justified his failure to grieve matters, and his taking of independent initiatives, on the ground that Business Agent Lee failed to cooperate in processing the grievances suggested by Smith. Smith testified it was the function of the business agent to file complaints for arbitration. The ALJ ruled that because Smith's attempts to press grievances were "futile," Smith was not exceeding his authority as shop steward by taking matters in his own hands. The ALJ's finding of futility was based solely on Smith's testimony; neither Business Agent Lee nor any union official appeared as a witness. Not only does Business Agent Singelais' letter referred to in the text, suggest another side to the story, there is little or nothing in the record by way of written communications between Smith and Business Agent Lee evidencing efforts by Smith to cause Lee to process a grievance, or taking Lee to task for failing to do so. By contrast, the record is replete with Smith's letters to outsiders and to Company officials registering complaints of all kinds.

of this letter was sent to "Floco Consol— Summit Industrial Ctr. Peabody," and another copy to the President of Wilson Freight, in Cincinnati, Ohio, with the comment,

> "Where it is company policy to involve customers in labor disputes, I feel that you would not mind if I involved them to insure that you follow the Interstate Commerce Commission's Regulations."

According to Smith's testimony, the I.C.C. responded that the Company could do what it was doing, as long as it provided equal service to all customers. What connection, if any, existed between employment conditions at the terminal and a complaint of this nature is not explained in the record.

At about the time of the I.C.C. complaint, Smith complained to the Occupational Safety and Health Administration (OSHA) concerning the Company's failure to provide personal protective clothing for drivers in the event chemicals or acids were spilled. An inspection was conducted at the terminal, and as a result the Company was cited for a non-serious violation and fined a small sum.

Soon thereafter, Smith was discharged, allegedly for violating a Company rule concerning the carrying of unauthorized passengers. In response, Smith filed an unfair labor practice charge on May 23, 1975, and also a contract grievance. The latter went to arbitration and was resolved in his favor resulting in his reinstatement, after which the unfair labor practice charge was withdrawn.

On August 25, 1975, Smith wrote to the Company's President in Ohio, signalling his intention henceforth to monitor the Company's compliance with Department of Transportation regulations. The sarcastic flavor of Smith's letter can be derived from the following excerpt:

> "Mr. Gantz:
>
> "Ever since arbitration I have been doing a lot of thinking. All this concern was brought on by just one simple statement by Jack McCarthy. He said, something like, it is the duty of a shop steward to know the D.O.T. rules and regulations and to obey them so as to set a good example for the men he represents.
>
> "Here all the time I thought I had been doing a pretty fair job at trying to obey the laws. Evidently I had not been trying hard enough.
>
> "Now that I am over my hurt feelings I have promised myself not to do just a good job but rather a great job.
>
> "I started to study the D.O.T. regulations again. Although I am making good progress I will now need your help."

Smith then described three areas where the Company was supposedly in default: it should (1) clarify what an unauthorized passenger was; (2) have drivers write up vehicle reports daily on trucks they drive; and (3) provide snow chains. Smith's parting shots were, "I would never want to subject the Company to the feeling that the Union is not doing everything in their power to uphold the law," and "P.S. If there are any other items that I come across in further review of the rules, I will be happy to let you know, where I now know of your concern."[7]

This letter was followed by a campaign to compel D.O.T. officials to take action against the Company in the areas cited. During much of this period, Smith was a candidate—ultimately unsuccessfully—for the position of union business agent in an election scheduled for the latter part of 1976. Throughout 1975 and much of 1976, D.O.T. officials took the position, in response to Smith, that the Company was exempt from the regulations which Smith said applied. Irritated, Smith wrote Congressmen Early and Drinan to enlist their support. He finally achieved a measure of success when, in the summer of 1976, a D.O.T. official called Rudolph informing him of the snow chains complaint—a call which Rudolph testified, because it came in

---

7. In rejecting out of hand the Company's contention that there was malice behind Smith's complaints, the ALJ made no mention of this letter.

the summer season, "blew his mind."[8] Other calls from D.O.T. followed. The upshot was that by winter of 1976, the Company had chains available at its terminal.

Also in the summer of 1976, Smith was involved in another incident which annoyed Rudolph. Smith made a telephone call to the local NLRB office sometime after the Board had dismissed an unfair labor practice charge filed on behalf of a co-worker, Swain. Smith testified that at the time he made the call, he knew the Board had found the charge to lack merit and that the Company had agreed to put Swain back to work. Asked why he did not consider the case closed at that stage, Smith said he did not think it proper that an arrangement had been made, sanctioned by Union Business Agent Lee, for Swain to return to work without back pay. Smith testified "it's very possible" that he told the Board representative, at this time after the charge had been withdrawn, that "the Company couldn't be trusted in these matters."

This completes a description of Smith's complaints. These were the basis of the Company's September 2, 1976 warning letter; and were held by the Board to be both the real and an improper reason for Smith's discharge. The Company, while asserting that it had every right to object to Smith's complaint activity as it did, denies discharging him for that reason. Instead it says it discharged Smith because of another matter, the so-called bid-voiding episode which occurred the very same week the warning letter was dispatched.

During 1976 there had been a dispute at the Chelmsford terminal between Rudolph and the drivers over the Company's systems for accepting bids on route assignments and times. The ALJ found that "[b]ids are job assignments that are posted and bid by the driver for starting times and jobs, according to seniority. Based on the uncontradicted record evidence, bid sheets are posted several times a year." Beginning in late 1975, the Company indicated that after the effec-tive date of the new bargaining contract, in April 1976, it would make certain changes in bidding practices which it believed the new contract authorized. These were resisted by Smith, who contended that the Company would be violating the maintenance of standards provision in the contract. The evidence is uncontroverted that Smith and Rudolph had disputed this matter on a number of occasions before the bid-voiding incident in September 1976 which preceded Smith's discharge. It is also undisputed that when management posted a sheet in August 1976 upon which the drivers were to indicate their preferences, someone wrote "Do not bid, illegal" thereon, resulting in no bidding by the drivers. Smith testified that he had done this, that he had similarly "voided" bid sheets "close to half a dozen times" previously that year, and that Rudolph knew he had done so. Rudolph denied that any bids had been voided prior to August, and denied knowing that Smith was responsible for the August episode since it occurred when Rudolph was on vacation.

In any event, Rudolph himself posted another bid sheet on September 1, 1976, and it is undisputed that Smith, after a discussion with some of the drivers and outside of Rudolph's presence, wrote "Void" across the face of it. It is also undisputed that none of the drivers thereafter filled out the bid form. September 1 was a Wednesday, and a note accompanying the bid sheet indicated that the sheet would be taken down by 12 noon on Friday, September 3. The assignments being bid for were to start the following week which, because of the Labor Day holiday on Monday, September 6, commenced on Tuesday, September 7.

Either late on September 2, or in the morning of September 3, Rudolph, having learned of the voiding of the bids, asked Smith whether he was responsible. Smith admitted he was, but claimed that he had received authority to do so from Lee, the business agent, and McCarthy, president of

---

8. Smith testified, reasonably, that unless the Company made plans to procure chains in the summer, they would not have them by winter.

the Local. A three-way phone conversation then ensued between Lee, Smith, and Rudolph, during which Lee told Smith to have the men bid the jobs and Smith said it was too late because the men were out and it was almost 12. Rudolph insisted that the bids were to come down by noon, in any event.

Later that day Rudolph discharged Smith. According to Smith, whom the ALJ credited, the only explanation Rudolph gave that Friday evening for discharging him was that he was being discharged under Articles 41 and 47 of the contract.[9]

On the question of whether Smith, as steward, had union authority to mark void on the bid sheet and discourage the men from signing up, Rudolph testified that on Friday, before firing Smith, he had inquired of both Lee and McCarthy and was told that neither had granted Smith authority to void the bids. (The relevance of whether or not they gave authority is that, under Article 41, it is a dischargeable offense for stewards to cause a slowdown or interrupt an employer's business except as authorized by official union action, see notes 3, 10.) A Company witness, one Tedesco, testified to overhearing Lee tell Rudolph he never authorized Smith to void the bids. Lee himself was not called as a witness at the Board hearing, but Lee appeared earlier before an arbitration panel which, by unanimous vote of union and employer members, voted to uphold Smith's discharge, and it can only be inferred that his testimony then was not supportive of Smith's claim to have received authorization. Smith himself conceded, in testimony before the Board, that he did not have "written" authority to mark void on the bids; he also admitted to having told the arbitration panel that he did not have "specific" authority from the Local's president, McCarthy. Given these concessions and the absence of any credible support for Smith's vague claim of authorization, we think the record would not support a finding that Lee or McCarthy ever authorized Smith to interfere with bidding practices, much less that such authority had been supplied by "official action of the Union" as Article 41 requires in the case of stewards' actions causing a slowdown or interrupting the Employer's business. The ALJ, in fact, made no such finding. He instead side-stepped the issue, stating,

> "I also credit Smith's version *that he apprised Rudolph* he had been given authority to void bids. Whether the authority was in written or oral form is immaterial." [Emphasis supplied.]

As the question was not what Smith told Rudolph but whether authority was in fact given, this finding resolved nothing, although it gives the misleading impression that Smith may somehow have received the union authorization necessary to validate his action.

Smith's discharge was discussed at a meeting between Smith, Rudolph and Lee on Tuesday, September 7.[10] On that day,

9. The ALJ found that it was not until a week after the discharge that Rudolph expressly told Smith he was fired for marking void on the bid sheet. Under any interpretation of the evidence this finding is wrong. Smith himself testified that the bid-voiding reason was given him by Rudolph four days later at a meeting on Tuesday, September 7—the first working day after his discharge. Rudolph and another company witness testified that when Smith was fired Friday afternoon he was expressly told this was because he had interrupted Company business and had exceeded his authority as steward by voiding the bids. Since Rudolph had first confronted Smith about the bids earlier Friday, and there had been considerable heated discussion about them that morning between Smith, Rudolph and Lee—with Smith's discharge occurring later the same day—it is hard to believe Smith was in the dark concerning the at least ostensible grounds for his discharge. Nothing else untoward occurred Friday.

10. Rudolph had mailed Smith the following discharge letter on September 3, which Smith received the next week:
> "This letter is to advise you that your actions of exceeding your authority as Shop Steward, is in violation of Article 41, whereby you caused an interruption of your employer's business, not authorized by Teamsters Local # 25, is cause for instant dismissal.
> "This action is taken in accordance with Article 47 of the [collective bargaining agreement]."
Article 41, see note 3 supra, describes the duties of the job steward, and provides that

Smith received in the mail the warning letter which the ALJ thought showed anti-union motivation. Rudolph had written the letter on Thursday, September 2, the day before the confrontation leading to Smith's discharge. We quote the letter in full:

"Mr. Smith:

As Shop Steward, at the Wilson Freight Company, your actions are controlled by Article 41, of the New England Supplement and the National Master Freight Agreement.

"Your authority specified by contract is not to exceed the provisions of Article 41 and any authority delegated to you in writing by the Teamsters Local 25.

"In the past, letters written and signed by you and personal complaints as Shop Steward, at Wilson Freight Company, have been sent to many Government Agencies, including D.O.T., OSHA and NLRB. Furthermore, you have written to Governor Dukakis, of the Commonwealth of Massachusetts, and demeaned Mr. E. Grady, Director of Labor Industries.

"In none of the above instances did you refer these matters to the grievance machinery, nor were you authorized by the Teamsters Local 25 to represent the Wilson Freight Company personnel in these matters.

"Recently, you called the National Labor Relations Board concerning the discharge of Colin Swain, although Swain's discharge had been filed with and was pending disposition before the Joint Area Committee. Swain was represented by Agent Lee, of Teamsters Local 25. Your action exceeds your authority as Shop Steward.

"The Company's position is that you are interfering with its business in excess of your authority as Shop Steward and this conduct amounts to gross harassment and will not be tolerated.

"This letter will serve as a warning that any further interference in the business of the Company or any conduct in excess of your authority as Shop Steward will result in your instant dismissal.

WILSON FREIGHT CO.
F. X. Rudolph
Terminal Manager

"cc:  Jack McCarthy
      Pat Lee—Business Agent—
      Local # 25"

In further support of his conclusion that the bid-voiding episode was only a pretext for Smith's discharge, the ALJ found that the Company did not lose any business as a result, nor make any late deliveries. The ALJ did not, however, mention the Company's undisputed evidence that the runs not bid because of Smith's action were able to be driven on schedule only because the Company went to the extra trouble of contacting drivers individually over the Labor Day weekend to assign runs for the following week.

Smith promptly challenged his discharge both through grievance channels under the collective bargaining agreement and by complaint to the NLRB. At the Union's behest, the grievance went to arbitration in October 1976, the panel consisting of three Union and three Company designees. After a hearing all six arbitrators unanimously denied Smith's challenge to his discharge, holding that "Mr. Smith did in fact exceed his authority as steward," and that his discharge did not violate Article 47 of the collective bargaining agreement so as to

"[t]he Employer . . . shall have the authority to impose discipline, including discharge, in the event the shop steward has taken unauthorized strike action, or work stoppage in violation of this Agreement."

Article 47 provides, "The employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension shall give at least one (1) warning notice of the complaint against such employee to the employee, in writing . . . ."

It was disputed at the hearing whether the warning provision in Article 47 limited the Company's right to discharge a steward for violation of the Article 41 work stoppage provision. The Company's industrial relations expert testified it did not. At the arbitration following Smith's discharge, the Company apparently tendered the warning letter of September 2 as evidence, if needed, of an Article 47 warning.

entitle him to reinstatement.[11] The arbitration proceeding was apparently limited to the question of Smith's authority to void the bid sheet; there is testimony before the Board that the arbitrators refused to hear evidence on the subject of Smith's complaints to government agencies. Their decision thus indicates that Smith's conduct in voiding the bid sheet constituted grounds for discharge under the collective bargaining agreement but does not encompass whether the Company's motivation for firing him was the complaints he had earlier filed. The arbitrators necessarily rejected Smith's claim that the Union, through Business Agent Lee or its president, McCarthy, had granted him authority to void the bids. Had Smith's claim to have received proper authorization been accepted, he would not have exceeded his authority as steward.

## II.

While the arbitrators thus upheld the discharge, the ALJ, in the decision which became that of the Board, ruled that the discharge violated §§ 8(a)(1), (3), and (4), see note 2, supra, being motivated not by the voiding of the bids but by Smith's earlier complaints. The Board held that the complaints were protected concerted activities.[12] It disposed of the claim that they were beyond a shop steward's authority, accepting Smith's assertion that Business Agent Lee had been recalcitrant in pressing grievances through regular channels. The snow chain complaint and the call to the NLRB, both of which preceded Smith's discharge by only a few months, were cited,

particularly, as reasons for the discharge. The Company's September 2 letter was viewed as flagrant evidence of anti-union animus. The reason claimed by the Company and accepted by the unanimous arbitration panel as constituting adequate cause under the contract for Smith's discharge— Smith's voiding of the bids—"was merely the reason given, the pretext, to govern the real reasons for the discharge." 234 NLRB No. 132 at 9 n.4. The ALJ credited Smith in all respects and found Rudolph, whose conduct on the stand he criticized, to have been "vague and inconsistent." The ALJ observed that Rudolph failed to explain, if voiding the bids was so important, why he did not investigate similar conduct which the ALJ believed had occurred earlier that year.

Citing *Filmation Associates,* 227 NLRB 1721 (1977), the Board refused to defer in any way to the arbitration decision, asserting that the arbitration panel's refusal to consider evidence on the subject of Smith's letters to government agencies had denied Smith the opportunity to litigate his unfair labor practice claim fully.

## III.

The ALJ's ruling that "[v]oiding of the bids was merely the reason . . . to cover up the real reasons for discharge," and that the "true" reason was Smith's complaints, follows a "pretext" mode of analysis for which we have criticized the Board when circumstances have demanded a less simplistic approach. *See NLRB v.*

11. There is no transcript of the arbitration hearing. A form containing the arbitration submission and decision was placed in evidence at the Board proceeding. The question submitted is as follows:

"Violation of Article 47. Discharge of Paul Smith. Union requests man be reinstated and made whole."

The decision reads as follows:

"Based on the evidence presented it is the unanimous decision of the Panel that Mr. Smith did in fact exceed his authority as steward at Wilson Freightways. Therefore, the claim of the Union is denied."

12. The ALJ termed Smith's complaints "union and protected concerted activity," and seems to

have had two theories: (1) insofar as the complaints related to "safety matters" they were protected; (2) "so long as the employee is acting not only in his own interest, but is attempting to enforce . . . contract provisions in the interest of other employees," this activity is protected. It was not specified to what contract provisions the various complaints referred. The ALJ made no effort to deal with the Company's claim that in making the complaints in the capacity of steward, Smith had been violating Article 41's limitations on a shop steward's powers.

The ALJ also found that Company criticism of Smith for complaining to the NLRB violated the Act.

*Eastern Smelting and Refining Corp.,* 598 F.2d 666, 669–72 (1st Cir. 1979). The Board dismissed out of hand the Company's tendered "good" reason as not a motivation at all, even though the evidence and the arbitration award both indicate that by inducing his fellows to refuse to bid on job assignments Smith was violating significant contract limitations upon a shop steward's authority, and was engaging in wildcat activity which Article 41 of the contract prohibits. Where the record so plainly reveals the existence of an objective cause for discharge, the Board may not reject it in cavalier fashion. *Id. See, e. g., Florida Steel Corp. v. NLRB,* 587 F.2d 735 (5th Cir. 1979). In such cases, a finding against the employer is warranted only if it can be inferred from the evidence that, without the concurrence of some established "bad" reason, the employee would have held on to his job notwithstanding a valid cause for discharge. *Eastern Smelting,* 598 F.2d at 670–71.

In refusing to treat the bid-voiding reason seriously, the Board gave no weight to the arbitrators' finding that Smith's actions constituted grounds for discharge. The Board and ALJ apparently felt that because the arbitration was not conclusive upon the unfair labor practices issues, it was altogether irrelevant. In this they were mistaken. The arbitrators' decision conclusively established that Smith's bid-voiding conduct constituted cause for discharge *under the collective bargaining agreement.*

To be sure, even if the discharge was contractually authorized, it might · have been an unfair labor practice. The arbitrators never considered if Smith's complaint activity improperly influenced his discharge, and they never examined all the issues encompassed by the unfair labor practices proceeding—even assuming, which we ·do not decide, that the arbitrators' rulings on ultimate unfair labor practices issues could have bound the Board. *Compare The Kansas City Star Co.,* 236 NLRB No. 119, at 4 (June 12, 1978) *with Filmation Associates,* 227 NLRB 1721 (1977). But while the arbitration did not foreclose the unfair labor practice issues, it did indicate that Smith's voiding of bids was misconduct

of so serious a nature as to be cause for discharge under the terms of the contract. The arbitration panel flatly rejected the contention made on Smith's behalf that firing Smith had violated the contract requirement that there be "just cause" for discharge. The panel ruled that Smith "did in fact exceed his authority as steward" when he voided the bids. These conclusions, rendered unanimously after an evidentiary hearing before a six-member panel composed equally of Union and Company designees, were matters of factual resolution and contractual interpretation within the peculiar competence of the arbitrators appointed under the grievance procedure. No labor law question, of a type appropriately left to the Board, was involved. We cannot see that Smith had any right to have these matters redecided differently by the ALJ or Board, nor was the Board entitled simply to ignore the findings of the arbitrators insofar as relevant. The Board's own policy is to defer to fair and regular voluntary arbitration proceedings where the decision of the arbitrator is not "repugnant to the purposes and policies of the Act." *The Kansas City Star Co.,* 236 NLRB at 4. *See Spielberg Manufacturing Co.,* 112 NLRB 1080, 1082 (1955).

■ It follows that the Board exceeded its authority to the extent it redecided in Smith's favor factual matters determined by the arbitrators that were essential to a determination of the contractual rights of Smith, his Union, and his employer. Notable among these was the ALJ's ambivalent finding, *supra,* that could be read to credit Smith's claim to have received authority from Business Agent Lee and President McCarthy to void the bids. If the ALJ meant to suggest that Smith obtained authority sufficient to comport with Article 41, requiring authorization "by official action of the Union," the arbitrators' finding that Smith had exceeded his authority is plainly conclusive both factually and as a matter of contract interpretation. As previously said, moreover, the record lacks substantial support for Smith's claim of authority.

The arbitration award also undercuts the ALJ's findings minimizing the impact of the bid-voiding on the Company's operations. It is true, as the ALJ found, that the Company did not lose business or suffer any late deliveries. But the ALJ said nothing about evidence that Smith's action forced the Company to go to the trouble of calling up the drivers individually over the weekend to schedule their runs; and by denying reinstatement, the arbitrators indicated that they viewed the conduct as a serious breach. Given the arbitrators' close association with the trucking industry, and their role as interpreters of the contract, the Board could not properly shrug off their conclusions. The very presence of a provision like Article 41 limiting the powers of stewards suggests that unilateral action by stewards and their followers poses a significant source of difficulty in the industry. The arbitration panel obviously felt that it was no small matter for a steward, in disregard of the contract and without authorization from high union officials, to induce drivers at a terminal to refuse their employer's method of assigning work. Given the arbitrators' conclusions, we do not think the Board could properly conclude that Smith's conduct was simply *de minimis.*

The result of the arbitration also undermines the ALJ's theory that because, as he found, Rudolph had quietly endured similar bid-voiding incidents earlier in 1976, the Company had surrendered any right to object to such conduct on the part of a steward. The same argument was available to Smith, for whatever it was worth, during the arbitration, and, if made, plainly cut no ice with the panel.[13] In determining that there was just cause for discharge, the arbitrators necessarily rejected any notion of condonation or waiver. It is unclear, in any event, how the Company's mere silence for at most six months in the face of similar misconduct would either destroy its right to question Smith's authority at a later time, or demonstrate that the Company acquiesced in his misbehavior.

The Board therefore erred insofar as it treated Smith's bid-voiding conduct as allowed under Article 41 (because of supposed Union authorization) and as too innocuous to constitute valid grounds for discharge under the contract. It should have begun with the premise that the conduct constituted just cause for discharge under the contract. It could then go on to ask whether in spite of the existence of such a sufficient ground for discharge, there was evidence to establish that Smith would nonetheless have been retained as an employee had it not been for the existence of another, improper, motivation in violation of §§ 8(a)(1), (3) or (4) of the Act. The existence of a valid ground for discharge does not always rule out a finding of unfair labor practice. People are not invariably fired for every misstep. Even where the misconduct, as here, was serious, it remains conceivable that the operative cause of discharge was some different "bad" reason. A good deal more is required, however, to support an unfair labor practice finding for wrongful discharge in the presence of an objectively established "good" ground for discharge than where the employer's tendered good reason turns out to be weak or extraneous. *Eastern Smelting,* 598 F.2d at 670. This is doubtless why ALJ's are sometimes tempted to disparage the employer's reason unjustifiably. Here the ALJ and Board succumbed to this easy but self-defeating approach. They should, instead, have accepted the validity of the employer's reason insofar as it went and concentrated on deciding whether that "good" reason was nevertheless insufficient, without the "bad," to have produced the discharge.

---

**13.** In *NLRB v. Eastern Smelting & Refining Corp.,* 598 F.2d 666, 671 (1st Cir. 1979), we reiterated:

"[T]he Board may not set up its own business standards and then condemn the employer for not following them."

This is especially so when the substantiality of the business reason has been upheld under the grievance procedure reflecting the agreement both of labor and management.

## IV.

If there were no other reason to disagree with the Board, a court might ordinarily remand to it with directions that it reanalyze the evidence in the manner just indicated. The Board would be directed to decide whether, notwithstanding the presence of a valid reason under the contract to discharge Smith, he would have been retained "but for" the bad one, i. e., his making of supposedly protected complaints. That procedure, however, is inappropriate here. Even had we not passed that point of indulgence, see *Eastern Smelting,* 598 F.2d at 671–72, we do not agree that Smith's complaint activity was exempt from his employer's criticism or that the company's response thereto in its September 2 letter was improper. The complaints, and the manner of their making, raised a serious question of Smith's contract authority as steward—a question which the company was not obliged to ignore. In short, even if irritation occasioned by the complaints was a key factor in the company's decision to remove Smith after the bid-voiding episode, rather than to apply a lesser sanction, this fact would not provide a basis for an unfair labor practice finding. We view the case, ultimately, not as one of mixed motive, but as one where the Board has failed to show that either of the purported reasons for discharge was improper. Accordingly, we reverse.

Under § 8(a)(1), it is an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of § 7 rights. *See* note 2, *supra.* Reading the September 2, 1976 warning letter as threatening retaliation for Smith's complaints about "safety matters and other matters encompassed in the collective bargaining agreement," the Board proceeded on the assumption that complaints of this nature were rights protected by § 7.[14] As the ALJ credited Smith's assertion that the complaints were made in the interest of others in the bargaining unit as well as of Smith himself, they were found to be "union and protected concerted activity." The employer's September 2, 1976 letter criticizing Smith for these actions, and threatening discharge if he continued, was viewed as unlawful interference with these protected activities and thus as direct evidence of "anti-union animus." As the Board saw it, all or most of the Company's irritation at Smith was rooted in its supposedly illegal objection to his protected conduct.[15]

The Board's conclusion that Smith's complaints were protected under the Act is not without initial plausibility. An employee's § 7 right to engage in concerted activities for "mutual aid and protection" has been held to go beyond affording protection for the narrower purposes of "self-organization" and "collective bargaining." Section 7 protects,

> "employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums, and [allows] . . . employees' appeals to legislators to protect their interests as employees . . . ." [Footnote with citations omitted.]

*Eastex, Incorporated, Petitioner v. NLRB,* 437 U.S. 556, 566, 98 S.Ct. 2505, 2512–13, 57

---

14. Section 7 reads as follows:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

15. In support of the § 8(a)(3) finding, the Board comes up with little by way of apt authority, citing to *Cameron Iron Works, Inc. v. NLRB,* 464 F.2d 609 (5th Cir.1972). The Board seems to argue that since Union supervisors, such as Lee, would not join in Smith's complaints, Smith's initiatives became de facto union activity within the protection of § 8(a)(3).

The Board supports the § 8(a)(4) finding on two bases described later in our discussion of that issue.

L.Ed.2d 428 (1978). *See Alleluia Cushion Co.*, 221 NLRB 999, 1000 (1975) (employee's OSHA complaint is concerted, protected activity).[16]

But while a letter attacking an employee for resorting to administrative forums and legislators might ordinarily be evidence of an anti-union "bad" motivation, *i. e.*, a motivation to subvert § 7 rights in violation of § 8(a)(1),[17] the present letter seems to us to reflect a perfectly proper business justification. Article 41 of the collective bargaining agreement between Smith's union and the Company places limitations upon the authority of stewards, and the Company could properly insist that so long as Smith held the duties and privileges of office, he observe those limitations. This is precisely what the September 2 letter attempts to do. We do not read *Eastex* as forbidding the parties to a collective bargaining agreement from adopting provisions narrowing the delegated powers of subordinate union officials, nor as preventing the employer from seeking to enforce such a provision by confining a steward's formal actions to specified channels.

Unlike the situation in *Alleluia Cushion* and similar cases, the Company's objection was not simply that an employee had gone to OSHA, D.O.T. or elsewhere, but rather that a union steward was acting in defiance of contract limitations upon his powers.

The September 2 letter begins with the statement that as shop steward of Wilson Freight, "your actions are controlled by Article 41, of the New England Supplement and the National Master Freight Agreement." It proceeds, "Your authority specified by contract is not to exceed the provisions of Article 41 and any authority delegated to you in writing by the Teamsters Local 25." It thereafter lists Smith's various complaints, emphasizing that they were written and signed by him as Shop Steward.

The letter continued,

"In none of the incidents did you refer these matters to the grievance machinery, nor were you authorized by the Teamsters Local 25 to represent the Wilson Freight personnel in these matters."

The Company warns towards the end of its letter that Smith is "interfering with its business in excess of your authority as Shop Steward and this conduct amounts to gross harassment and will not be tolerated." Copies of the letter were noted as being sent to "Jack McCarthy," the union president, and "Pat Lee—Business Agent—Local # 25."

The thrust of the letter was therefore that Smith was in violation of the contract—a reasonable enough charge in the circumstances. Article 41 states that the

---

**16.** The Board also calls attention to authorities treating as protected activity under § 7 self-help efforts by individual employees to enforce their own reasonable understanding of the terms of a collective bargaining agreement. *See, e. g., NLRB v. John Langenbacher Co.*, 398 F.2d 459 (2d Cir.1968); *B & M Excavating, Inc.*, 155 NLRB 1152, 1154 (1965), *enforced*, 368 F.2d 624 (9th Cir.1966). We do not find these authorities particularly relevant here since the ALJ's opinion does not indicate what contract provision, if any, Smith may have been enforcing nor whether the actions he took were reasonable. Moreover, these cases did not involve an employee acting beyond the authority which the contract accorded him. *See infra.*

**17.** This is not to say that all manner of complaints to agencies and legislators are automatically protected. Several of Smith's complaints would seem undeserving of § 7 protection in any event. The heat complaint and the gratuitous complaint to the NLRB after Swain returned to work, were in opposition to positions taken by the Union itself. Being contrary to the principle of exclusive representation, such conduct would not seem entitled to the protection of § 7. *See Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975).

Smith's ICC complaint, being unrelated to the improvement of working conditions, *see Eastex, supra*, was also unprotected. Indeed, to the extent Smith may have circulated this to one of his employer's customers, it raised questions of disloyalty and malice which, however, we need not consider. *See NLRB v. Local 1229, IBEW (Jefferson Standard Broadcasting Co.)*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953). This complaint was not specifically mentioned in the September 2 letter although it apparently was encompassed by the reference to "letters written and signed by you and personal complaints as Shop Steward . . . to many Government Agencies."

authority of stewards "shall be limited to, and shall not exceed," certain specified duties and activities, including the investigation and presentation of grievances to the employer or the designated company representative in accordance with the provisions of the contract. Smith's exclusive reliance upon outside complaints, which he expressed in virtually every instance in the capacity of shop steward, not privately, went well beyond the procedures described in Article 41.[18]

■ Since the Company's criticism of Smith was founded on a reasonable claim of contract violation, the Board erred in concluding that the September 2 letter evidenced anti-union motivation. The record, indeed, is devoid of circumstances evidencing anti-union bias. Smith's own testimony was as critical of the Union and of his superior, Lee, as of his employer; there is no evidence that the Company was unhappy with the Union as such, nor that it sought to trample upon the § 7 rights of individual employees. The evidence rather reflects strong personal differences between Smith, as Union Steward, and the terminal manager, culminating in a supportable contention by the employer that Smith was acting beyond his contract authority.

The absence of evidence of improper motivation would normally be fatal to the § 8(a)(1) and § 8(a)(3) claims. *See NLRB v. Great Dane Trailers*, 388 U.S. 26, 33, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *NLRB v. Borden, Inc.*, 600 F.2d 313 at 319–321 (1st Cir.1979). Wrongful motivation need not be demonstrated, however, when conduct is "inherently destructive" of important employee rights. We shall therefore consider whether Article 41 itself or the Company's attempt to enforce it against Smith amount to conduct destructive of important rights.

·Article 41 is aimed at limiting the ability of stewards located at separate installations to gather into their own hands personal authority outside the Union's chain of command and its grievance procedures. Just as a bank may limit the power of officers to sign checks in excess of a certain sum, unions and employers may agree to confine the powers of the subordinate union officials in the interest of orderly collective bargaining. Article 41 leaves to the employer the disciplining of stewards who engage in interruptions of business violative of the agreement. Whether Smith's complaints, individually or collectively, were sufficient to warrant the threat of discharge contained in the September 2 letter would be a matter that could be determined under the grievance mechanism. The Company sent copies of its letter to Union officials, indicating that it was prepared to defend its positions through the normal channels.

We see nothing contrary to sound collective bargaining principles in a provision such as Article 41. An individual employee's normal right, derived from § 7, to complain to officials and legislators does not prevent the parties to a collective bargaining relationship from placing limits upon the powers of particular union officials in order to lessen the danger of wildcat strikes and work stoppages and smooth the process of collective bargaining. While the extent to which Smith's complaints actually interfered with the Company's work may be debatable, Smith's ability to secure the attention of public officials and fellow employees was enhanced by his office as steward—an office which, under the contract, provided him with super-seniority for all

18. To be sure, neither we nor the Board have plenary authority to construe collective bargaining contracts. *See NLRB v. Strong*, 393 U.S. 357, 360, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969). However, in an unfair labor practices proceeding the Board and courts may assess the terms of the contract for purposes of determining whether the Company acted reasonably and in good faith. *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 437–38, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967) (incidental interpretation of contract permissible to decide an unfair labor practices case); *see NLRB v. Strong*, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969); *NLRB v. Great Dane Trailers*, 388 U.S. 26, 37, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967) (Harlan, J., dissenting). Our reading here indicates that the Company's claims against Smith were nonfrivolous and had a reasonable basis in the terms of the contract. As the September 2 letter reflected a business basis for criticizing Smith it was not probative of anti-union bias.

purposes including layoff. His office could cause administrators and legislators to believe that he was speaking for the Union, thus giving Smith power greater than the ordinary employee to bring pressures to bear upon the Company, and increasing the risk of multiple demands upon the employer from competing sources.

In *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. at 62, 95 S.Ct. 977, the Court approved the policy of "fostering collective bargaining" through majority rule. It refused to permit minority employees to bargain directly with the employer thereby diluting the strength of the bargaining agent, and subjecting the employer to competing demands. It quoted as follows from *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 581, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960):

> "The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement." 420 U.S. at 67 n.19, 95 S.Ct. at 987, n.19.

The *Emporium* Court went on to quote as follows from *NLRB v. Allis-Chalmers Manufacturing Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967):

> "National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees. 'Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights

of those whom it represents . . ., 65 S.Ct. 226, 232, 89 L.Ed. 173.' *Steele v. Louisville & N. R. Co.*, 323 U.S. 192, 202. Thus only the union may contract the employee's terms and conditions of employment, and provisions for processing his grievances; the union may even bargain away his right to strike during the contract term . . . ." 420 U.S. at 63–64, 95 S.Ct. at 985.

■ In light of the foregoing, we see nothing "inherently destructive" of the national labor policy in a provision such as Article 41 requiring stewards to act through established channels rather than unilaterally. While such a provision may result in a steward's surrendering prerogatives he would have as an individual employee, it assures a more efficient pooling of employee strength and avoids both divisive disputes within the Union and the problem the employer would face were each terminal an isolated fiefdom. By the same token, it is not destructive of employee rights for an employer to criticize a steward, who in its reasonable judgment, is acting in violation of such a provision. To muzzle the employer, as the Board would do here, is to prevent him from attempting to police a lawful provision intended to prevent individual stewards from overstepping the bounds of their office.[19]

■ The present record is without evidence, other than Smith's own assertions, of efforts on his part to utilize the grievance machinery as Article 41 contemplates. No union official testified beside Smith, and Smith, an unsuccessful candidate for Business Agent, was hardly disinterested. Nonetheless, without hearing from Business Agent Lee or the Local's president, McCarthy, the ALJ unhesitatingly accepted Smith's testimony that Lee was derelict in failing to process grievances. There is no credible evidence from which such a judg-

---

19. Article 41 contains a sentence exculpating the Union for liability to the Employer for unauthorized acts of stewards, and provides that the Employer "in so recognizing such limitations shall have the authority to impose proper discipline . . . ." If it is an unfair labor practice for the employer to attempt to police Article 41 by imposing discipline, the Article will likely prove unenforceable in view of the Union's disclaimer of responsibility for enforcement.

ment could be made. It is possible that Lee was derelict, but it is equally possible either that Smith did not seriously seek to use the grievance machinery (see Business Agent Singelais' denial of Smith's claimed filing of heat grievances, note 6, *supra* ) or else that the matters he presented did not, for good reason, impress higher Union officials as meritorious. Business Agent Lee was not required to process every grievance. If a grievance seemed inappropriate, he could, in good faith, refuse to present it. *See generally Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). As the Court has recently said in *International Brotherhood of Electrical Workers v. Foust*, —— U.S. ——, ——, 99 S.Ct. 2121, 2127, 60 L.Ed.2d 698 (1979):

> "Union supervision of employee complaints promotes settlements, avoids processing of frivolous claims, and strengthens the employer's confidence in the union. . . . Without these screening and settlement procedures, the Court found that the costs of private dispute resolution would ultimately render the system impracticable. . . ."

We can find no basis in law for the Board's ruling that Smith, as steward, was absolved from acting within the scope of his authority simply because of his assertion of dissatisfaction with Lee's performance. If the ALJ had in mind that the Union was failing in its duty of fair representation, this serious charge should have been developed at a hearing at which Union officials could testify and respond to Smith's charges. *Vaca v. Sipes, supra.* Reasonable minds would not be content to rest such a finding on the testimony of a single, highly interested witness when many other knowledgeable witnesses were available but never called.

We therefore reject the Board's finding that the September 2 letter was indicative of anti-union or any other improper motivation, nor do we find it or Article 41 inherently destructive of employee rights. As remaining evidence was insufficient to establish a § 8(a)(1) violation, we reverse the Board's finding thereof.

## V.

As already indicated, *see* note 15, *supra*, there is no support for the finding of a § 8(a)(3) violation. There is not a shred of evidence that Smith was discharged in order to encourage or discourage membership in any labor organization. The Company appears to have normal working relations with Local 25, Smith's Union; its problem with Smith centered around its belief that Smith in the capacity of steward was acting beyond contract authority—a claim unanimously sustained, insofar as the bid-voiding issue was concerned, by an arbitration panel composed in part of Union representatives. Board counsel's argument in favor of the § 8(a)(3) finding is farfetched: because Lee would not press Smith's grievances, he argues, "Smith, as shop steward, was forced to pursue the complaints himself" in order to represent the unit employees, and his discharge "for carrying out this union related activity" supposedly violated § 8(a)(3). This argument stands on its head the doctrine expounded by the Supreme Court in *Vaca v. Sipes* and *IBEW v. Foust, supra.* Instead of being bound by proper union determinations of what matters may be grieved, a steward is accorded a presumptive de facto right to speak for the union upon a showing, without more, that he was turned down by a union superior! Independent ventures, undertaken in defiance of superior union authority, become union-related activity. It is not surprising that the Board presents no relevant authority for this theory. We regret that Board counsel are reduced to arguments of this type, just as we regret that a case of this complexity was decided by the Board—supposedly expert in this area—on a summary affirmance of an ALJ's decision which left much to be desired both factually and in terms of sensitivity to the difficult legal issues.

## VI.

There is finally the question of a § 8(a)(4) violation. The Board advances two theories. The first is that the objection in the Company's September 2 letter to Smith's letters and complaints to "many Govern-

ment Agencies, including D.O.T., OSHA and NLRB" refers to Smith's own unfair labor practice charge filed May 23, 1975, which he later withdrew after achieving a successful result in arbitration. The second theory is that Smith's telephone call to the Board, after the Swain matter was resolved in a manner not to his liking, was a protected communication.

■ We do not think there is substantial support for the first interpretation of the Company's letter. The paragraph immediately following the paragraph to which the Board objects reads, "In none of these instances did you refer these matters to the grievance machinery . . ." Since Smith's earlier discharge, which was the subject of his unfair labor practice complaint, was grieved, it would seem clear that this was not the subject of the Company's objection. We agree with the Company that the September 2 letter was referring to the Colin Swain incident—not to this fifteen month old complaint of which there is not the slightest evidence the Company ever made an issue.[20]

■ We also find lacking in merit the Board's argument that § 8(a)(4) was violated by the Company's criticism of Smith for his role in the Swain incident. We agree with the Company that the evidence indicates that Smith called the Board after the unfair labor practice charge was withdrawn essentially to vent his spleen on account of the nature of the settlement. The settlement had been approved by the Union as well as the Company, and Smith's action did not involve providing information in respect to a future or pending proceeding, *compare NLRB v. Scrivener*, 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1971), but was merely an expression derogatory of his employer resulting from annoyance with both the employer and the Union officials who had endorsed the settlement. Perhaps even in this posture Smith's right to communicate with

the Board would be protected if it had appeared that he was providing information to the Board which served some purpose under the Act, but the principal reason for the call seems to have been to grumble after the fact that the Company "couldn't be trusted in these matters." As has been discussed, Smith, in his role of steward, was bound by the collective bargaining agreement. As a union steward, he had no right, in that capacity, to take unilateral actions designed to undercut the decisions of his Union superiors. If after such a settlement as was made here between the employer and Union resulting in reinstatement of Swain and withdrawal of his unfair labor practice charge, a subordinate Union official like Smith could jeopardize the settlement because of his personal disapproval, the Union's credibility with the employer might be seriously undermined and its bargaining position in future matters weakened. *See generally Emporium Capwell Co., supra*. Even assuming *arguendo* that an ordinary employee, acting in a personal capacity, would be protected in a communication of this type with the Board, the Company can surely insist that Union stewards act in accordance with contract limitations upon their authority in order to promote orderly bargaining.

We therefore reject the finding of a § 8(a)(4) violation.

## VII.

We accordingly hold that the September 2 letter was neither in itself violative of the Act, nor was it evidence of improper action under § 8(a)(1) or the other cited sections of the Act. We further hold that the record as a whole is lacking in substantial evidence to support the findings that Smith was discharged for an improper "bad" reason. We reverse the Board's findings that Smith's discharge was illegal and decline to enforce its orders relative thereto.

*So ordered.*

---

**20.** It would, to say the least, be a blunder of the first magnitude for a Company, in a letter drafted by counsel for circulation to the Union, to take a Union steward to task for filing an unfair labor practice charge on his own behalf in a situation later resolved in his favor. To conclude that this was what the Company intended would be to assume that it and its counsel were totally incompetent.