**TEXAS INSTRUMENTS
INCORPORATED,
Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**No. 78–1268.**

United States Court of Appeals,
First Circuit.

Argued March 15, 1979.

Decided June 4, 1979.

Wayne S. Bishop, Washington, D. C., with whom Thomas P. Gies, and Seyfarth, Shaw, Fairweather & Geraldson, Washington, D. C., were on brief for petitioner.

Jerrold J. Wohlgemuth, Atty., Washington, D. C., with whom John S. Irving,

General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and John G. Elligers, Atty., Washington, D. C., were on brief for respondent.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, PETTINE*, District Judge.

COFFIN, Chief Judge.

The major issue in this petition for review is whether the National Labor Relations Board (Board) properly found that the petitioner, Texas Instruments Incorporated (TI), at its Attleboro, Massachusetts, plant violated Sections 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* (the Act), by discharging six employees who, in their organizational efforts, distributed leaflets containing wage survey material which had been classified under TI's security system. A secondary question is whether the Board properly found a violation of Section 8(a)(1) of the Act in TI's rule prohibiting its employees from discussing its wage schedule with outsiders.

### The Factual Background

TI is a major manufacturer of sophisticated electronic products and much of its work is defense related. It therefore has had, since 1960, a well developed internal security system, to deal adequately with defense security demands, to protect itself against those who would seek highly valued technological product and process information, and to safeguard certain managerial information including "competitive or business intelligence". There are two levels of classification: "TI Strictly Private" and "TI Internal Data". The former is the more sensitive and is applied to all "important TI information or material of a proprietary nature, the unauthorized use or disclosure of which could seriously impair the interests of TI". A deliberate dissemination of information so classified to those who are not employees who "need-to-know" the contents in connection with their work invokes the sanction of immediate and summary discharge. This sanction, while invoked only a few times since 1960, has been regularly applied in cases of proven wilful disclosures of classified material.

TI is strongly opposed to unionization of its plants. So far as the record indicates, this policy has not led, apart from the events with which we deal in this case, to any illegal anti-union activity. All four of the unfair labor practice charges previously brought against TI in the past ten years have been unconditionally withdrawn or dismissed. Frequent leafletting has taken place. Of the 5000 employees at the Attleboro plant, approximately ten constitute the core of the Union Organizing Committee. Some of those, well known union proponents, have been given offers of promotion or have been promoted. All received good ratings on performance reviews during the year prior to the events here in issue.

The company, as a matter of policy, seeks to make its schedule of wages and benefits competitive in the area. Its primary means of realizing this objective is to conduct a yearly wage survey among employers in the area of wages and benefits for specific jobs. The data sought include the number of employees in a specific job category, and the minimum, maximum, and average rates of pay. In seeking the cooperation of other employers TI advises them that "all data will be treated with strict confidence". When it sends cooperators the survey results, it lists the companies, identified only by a code letter, in order, the highest paying employer being first. TI informs each cooperator of its own code letter and also TI's. TI repeats that the wage data is "submitted in confidence and we trust will be treated appropriately." TI uses the wage analysis sheets based on the data to help its top managers arrive at its wage increase decisions. TI's analysis sheets differ from the survey results sent to cooperators in that all companies are listed by name. They have always been classified "TI Strictly Private", and, indeed, bear the stamped classification label.

* Of the District of Rhode Island, sitting by designation.

Some time before May 25, 1977, a copy of TI's most recent wage survey analysis sheets was anonymously mailed to the Organizing Committee's post office box. Members of the Committee were never implicated in the mailing. After receipt of the papers, members of the Committee discussed the information; realized that it would be helpful in their attempts to unionize the company, inasmuch as organized plants were shown to be paying higher rates; and cut off the "Strictly Private" label, reduced and reproduced in a leaflet two comparative tables of wages, one comparing rates for a grade 2–3 benchworker at TI and sixteen other named plants and the other comparing rates for a grade 10 toolmaker at TI and 15 other named plants. Narrative material pointed to the moral:

> "The key thing for setting the wages in this area is what the union shops are doing. Take G.E., for example, doing the same work we're doing but making well over $1.00 more an hour, because workers there have struggled over the years through their union for a decent wage. If it wasn't for these organized places paying better wages to bring the average up, we'd be down there with Balfours."

On May 25 the leaflets were distributed at 6:30 a. m. TI's management became aware of the use of the information, Augat and Balfours, two companies at or near the bottom of the tables, called TI to express their concern. The leafletting continued at 3:30 p. m. and management representatives contacted four of the distributors, informing them that the leaflet contained "Strictly Private" matter and warning them that continued distribution would subject them to summary termination. They and others met in the evening. One of them testified, "We discussed it and our decision was that if the company did have any rights in the matter, had any claim on the material or anything of that sort; then they would have confiscated the leaflet right on the

spot or taken some kind of measures against us. And, since that hadn't happened, we decided to go out again the next day."

On the next morning, May 26, the leafletting continued, notwithstanding renewed warnings. Later in the day the six people who had been distributing the leaflets were interviewed and then suspended. Five days later TI concluded that evidence was lacking to implicate the employees in the original leak of the data, but that the six employees had wilfully disseminated classified materials and that company policy required immediate termination.

### The ALJ's Decision

The ALJ's first step was to state: "That the reason why they were discharged was literally because the six engaged in that sidewalk distribution activity, is . . . conceded.[1] That discrimination in employment . . . for such activity is an unfair labor practice . . . is so obvious that no citation of authority is required at this late date. All that has to be decided is whether there is any merit in the defense argument that in this case there were special circumstances that must excuse what is on its face the clearest unfair labor practice imaginable."

The decision then proceeded to describe the defense. It set forth TI's "studied technique" to use the periodic wage surveys in a selective fashion "conveying the thought that [the employees] are doing well by comparison" with others. After detailing the circumstances of the leak of the wage data and the use thereof in the campaign leaflet, the ALJ described the reasons advanced by TI to justify the discharges as "really argument" to the extent that they declared the classification "of value to the Company, helps its position in a competitive market, and serves the purpose of keeping unions out of the plant."[2] He continued by saying

---

1. To state respondent's position as a "concession" and so to describe it, leaving out the content of what was being distributed, has the appearance of stacking the deck.

2. We have not found, unsurprisingly, any testimony of company witnesses that the classifying of information about other companies' wages has or serves "the purpose of keeping unions out of the plant."

that to the extent that the company's "generalizations and conclusions, real or fancied, have anything to do with the employees, the only substantive evidence . . . [of misbehavior] is the Company's handbook, which does contain rules of conduct. And there the only one which could, if at all, apply to what these six did, . . . reads: 'The following major infractions may be considered grounds for termination: . . . Disclosure of classified material to unauthorized persons.' "

The third and final step is the conclusion of the ALJ, with no findings of fact other than the description of "The Asserted Defense" summarized above. He finds unpersuasive the argument that knowledge of other companies' wages is to be equated with commercial or defense secrets; labels the argument that such knowledge is a matter of proprietorship "sound and fury signifying nothing"; and feels that it would "demean this decision to discuss at length" why the employees' use of the leaked information for organizational purposes was not likely to injure or destroy TI's business. The ALJ endorsed the General Counsel's theory that "[w]hen the wages of the employing company are so inextricably entwined with the wages of other employers, and the employing company so advises its employees, it should not be allowed to place any greater restriction on the discussion or disclosure of the other employers' wages than it can place on the discussion of its own wages."

Concluding that the "attempt to place this incident within the rules of conduct set out in the employee handbook is . . . unconvincing", the ALJ found that the company discharged the employees "with an object directly to discourage their statutorily protected right to self-organization." [3]

### Our Analysis

In proceeding with our own review, we first note the complete absence of reference to case authority in connection with the ALJ's decision of the discharge issue. Of course there is no merit to citation merely as a display of scholarship. But we would have thought that any ALJ dealing with a discharge case in this circuit would be aware of the efforts of this and other courts over the years to articulate a rationale governing analysis of such cases. In any event the decision proceeded as if there were no special strictures guiding analysis: the discharge was the "clearest unfair labor practice imaginable"; the asserted defense was without substance.

The absence of an analytical framework was compounded by the way in which the ALJ characterized the action of the employer: discharging employees "because the six engaged in . . . sidewalk distribution activity." This characterization of course begs the ultimate question of motive and would render any further analysis superfluous. And if further analysis were to be undertaken, such a perception of TI's conduct would at least impose upon it a heavy burden of justification. Setting up the problem in this way may well have led the ALJ to his total dismissal of TI's proffered "excuse", its rule requiring termination for wilful distribution of classified material, deeming TI's effort "unconvincing". [4]

■ Perhaps because of the ALJ's lack of analysis, TI and the Board have viewed this appeal from two entirely different perspectives. TI, looking on this as a typical

---

**3.** The Board noted that it had reviewed the record and found no basis for reversing the ALJ's credibility findings. We quite agree since we have found no such findings to reverse. The Board also disassociated itself from any of the ALJ's unspecified "gratuitous comments which are unnecessary to the ultimate findings and conclusions herein". These steps taken, the Board briefly affirmed.

**4.** We realize that tempers and patience run short in extensive, hard fought labor-manage-

ment hearings. But this makes it all the more important for the presiding officer to set an example of evenhandedness. The sharp retort, the sly dig, the sarcastic innuendo cannot fail to give the appearance of injustice, no matter how sound and fair may be the final judgment. Our concern about such matters was activated at a number of points in the hearing below. *See* Tr. 56, 59, 68, 88, 92, 154, 195, 233, 238, 324, 340, 372, 375, 376, 390, 391.

dual motive discharge case, has criticized the Board for not adhering to our requirement that motive for the discharge be determined. *See NLRB v. Eastern Smelting and Refining Corp.,* 598 F.2d 666 (1979). The Board looks on the case as one in which an employer's rule directly penalizes protected activity, and the employer has not demonstrated a sufficient business justification for that rule. The Board is correct in viewing this as a case where, before it need attempt a weighing of good and bad motive, it must determine the validity of the rule as applied to this case, on which TI relied as its justification. If the rule requiring summary discharge for wilful dissemination of "strictly private" material, as applied to employees distributing innocently obtained, classified wage survey data in an organizing leaflet, is held invalid, under § 8(a)(1) of the Act, a discharge based on such rule would be in violation of § 8(a)(3). *See Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 805, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). This is so because the employer's asserted motivation—i. e., enforcement of a rule—must be in support of a rule not prohibited by labor law. If it is not it could not support a discharge even if the motivation to enforce the rule, a neutral not an anti-union objective, were the employer's only motivation for that discharge.[5] If the rule were held valid, however, then the inquiry into motives, recently outlined in *NLRB v. Eastern Smelting, supra,* would be material.

The difficulty presented on this record is that, while we perhaps can sense how the ALJ and the Board might have found if they had assessed the validity of the rule, the issue was never confronted. The ALJ recognized that among the rules in the handbook there was only one which "could, if at all" apply to the discharged employees' conduct, but finally concluded that TI's attempt to bring the incident within the rule failed. We cannot read these cryptic references as embodying the kind of careful analysis required by *Republic Aviation Corp. v. NLRB, supra,* and particularly *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956). While the Court in the former case had held invalid a rule barring, among others, employees from distributing union literature on plant property, the question in the latter case was whether an employer could bar nonemployee union organizers from so distributing. The Court observed:

> "This is not a problem of always open or always closed doors for union organization on company property. Organization rights are granted to workers by the same authority, the National Government, that preserves property rights. Accommodation between the two must be obtained with as little destruction of one as is consistent with the maintenance of the other. The employer may not affirmatively interfere with organization; the union may not always insist that the employer aid organization." 351 U.S. at 112, 76 S.Ct. at 684.

Noting that different considerations apply to restrictions on employees and those on

---

5. Under *NLRB v. Great Dane Trailers,* 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967), motive may also be irrelevant if "the employer's discriminatory conduct was 'inherently destructive' of important employee rights". This exception is based on the principle that "some conduct carries with it 'unavoidable consequences which the employer not only foresaw but which he must have intended' and thus bears 'its own indicia of intent.' " *Id.* at 33, 87 S.Ct. at 1797, *quoting NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 228, 231, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). The Board argues that the company's reason for discharge which it characterizes as "distributing organizational leaflets containing 'strictly private' information", brought its actions within *Great Dane's*

"inherently destructive" category. On this record we do not agree. The company's conduct was that of discharging employees for violating a rule that could apply to those not engaging in protected activity as well as to these union organizers. If the Board determines that the rule is otherwise valid, it would be straining to conclude that enforcing the rule revealed an inherent intent to interfere with employee rights simply because the employees' violation occurred during the carrying on of protected activity. We have rejected the proposition that an employee is immune from discharge for an act committed while engaging in protected activity. *NLRB v. William S. Carroll, Inc.,* 578 F.2d 1 (1st Cir. 1978).

non-employees, and that the evidence revealed no difficulty of access to employees by others which would justify use of the employer's property, the Court held that the Act "does not require that the employer permit the use of its facilities for organization when other means are readily available." *Id.* at 114, 76 S.Ct. at 685.

■ We cannot predict whether discriminating analysis in this case would result in holding that the application of the security rule to wage survey data impermissibly burdened protected activity or that the employer was not compelled to allow distribution of classified but leaked wage survey data because "other means [were] readily available" to employees to accumulate the same or similar information or otherwise to support the same or similar arguments in favor of unionization. In making this determination, it is of course "the primary responsibility of the Board and not of the courts 'to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.'" *NLRB v. Fleetwood Trailer Co., Inc.,* 389 U.S. 375, 378, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967), *quoting NLRB v. Great Dane Trailers,* 388 U.S. 26, 33–34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). The point is that, in order to reach the proper balance between TI's interests in security and maintenance of discipline and the employees' organizational interests, the Board must focus on the issues of the validity of the rule invoked by the company to justify the discharges, just as it did in *Jeannette Corp. v. NLRB,* 532 F.2d 916 (3rd Cir. 1976).

Only if the rule as applied is determined to be valid under the Act would the Board face the task of assessing motive. As we have recently pointed out in *NLRB v. Eastern Smelting, supra,* there are two steps in the motive analysis. The first is the determination that a significant "bad", or anti-union, motivation contributed to the discharges. The second is the subsequent weighing of the employer's defense that a "good" reason for the discharge existed and would have produced the discharge even in the absence of the bad reason.[6]

■ If the case proceeds to this stage, the factfinder is bound to weigh the employer's asserted justification with some delicacy and deference. "It is important in cases involving business judgment that the Board not set up its own standard, and then conclude that, since the employer had another, it was ipso facto suspect." *Eastern Smelting supra,* 578 F.2d at 673. The ALJ and the Board cannot dismiss an employer's justification entirely, as having no weight or substance at all. Rather there must be a weighing of the relative strengths of the good and bad motivations, not to determine how the Board would have behaved under similar circumstances but to determine what in fact motivated the employer. Before liability can be imposed, there must be a determination in accordance with *Mt. Healthy, supra,* and *Givhan, supra,* that the discharges would not have taken place but for the improper motivation.

### The 8(a)(1) Issue

■ The second issue arises out of an 8(a)(1) charge based on the existence of a company policy classifying wage schedules as "T.I. Internal Data" and thus barring TI employees from discussing or disseminating TI's wage schedules with outsiders. Indeed the proscription bars revealing to outsiders, according to the company's manual, "Excerpts from wage and salary schedules". The ALJ and Board observed that this would prevent employees from talking to the public or union organizers about wages and that they would be "effectively muzzled where it counts most." The only justification for the classification put forward by respondent was that public knowledge of its wage rates would assist competitors to figure out its costs and raid its employees. But this argument is utterly deflated by the fact that TI, in mounting its annual wage

---

6. This formulation is in substance that found in *Mt. Healthy City Board of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and *Givhan v. Western Line Consol. School Dist.,* —— U.S. ——, ——, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

survey, gives out its own wage data to every one of its competitors within a 25 mile radius. We therefore have no difficulty in affirming the weighing process and conclusion of the Board.

*The order as to the 8(a)(3) and (1) violation is set aside and the case remanded to the Board for further proceedings in accordance with this opinion. The order as to the 8(a)(1) violation shall be enforced.*