Dickran KEOSAIAN, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Jewel Companies, Inc., Star Market Co.
Division, Intervenor.

No. 80–1002.

United States Court of Appeals,
First Circuit.

Submitted June 6, 1980.
Decided Sept. 17, 1980.

Dickran Keosaian, pro se.

William A. Lubbers, Gen. Counsel, John
E. Higgins, Jr., Deputy Gen. Counsel and
Elliott Moore, Deputy Associate Gen. Coun-
sel, Washington, D. C., on brief, for The N.
L. R. B., respondent.

Murray S. Freeman, David E. Watson
and Nutter, McClennen & Fish, Boston,
Mass., on brief, for intervenor, Jewel Com-
panies, Inc., Star Market Co. Division.

Before COFFIN, Chief Judge, CAMP-
BELL and BOWNES, Circuit Judges.

PER CURIAM.

This is a petition for review, brought
under 29 U.S.C. § 160(f), of an order of the
National Labor Relations Board dismissing
a complaint which charged Jewel Compa-
nies, Inc., Star Market Division, with dis-
charging an employee because of activities

alleged to be protected by section 7 of the National Labor Relations Act, in violation of section 8(a)(1) of that Act. We affirm the Board's dismissal of the complaint.

The Board adopted the rulings, findings, and conclusions of the Administrative Law Judge (ALJ) rendered after an evidentiary hearing at which the following facts were established.

Dickran Keosaian was an employee of Star Market from 1956 until March 31, 1978. While employed at Star Market, Keosaian attended law school and was admitted to the Massachusetts Bar. At the time of his discharge, Keosaian was working as a receiver at the Dorchester store.

For one or two years prior to 1976, Keosaian had taken it upon himself to collect and bank money from his fellow employees, returning the money with interest each year at Christmas time. During 1976 and 1977, Keosaian discussed with other employees the prospect of starting a credit union. After receiving favorable responses Keosaian discussed the procedure for forming a credit union with officials of the National Credit Union Administration, a federal agency.

On March 21, 1978, Keosaian sent a letter to the President of Star Market advising him that he had filed an application for establishment of a credit union for Star Market employees. The letter requested a meeting with the President, and asked him to distribute announcements at each store. While awaiting the President's reply, Keosaian attempted to post announcements of the proposed credit union at the Dorchester store. The store manager, however, advised him to wait for a response to his letter before posting the announcements.

On March 24, Keosaian telephoned the President's office and left a message requesting his approval of the credit union project and permission to use a company lunch room for a meeting. Later on March 24, Keosaian received a call from Katherine Nicholson, Star Market's vice–president for human resources. Ms. Nicholson advised him that she was handling the credit union matter for the Company, that she was interested in setting up a credit union, and had been working on the idea "for some time." She agreed to meet with Keosaian on March 31 "to have coffee with [him] and discuss a credit union."

Later that same day, Keosaian received a call from David Missirian, a Star Market employee who was also his nephew. Missirian, saying that the Company had "got the jump on you," told him of a notice which Star Market had posted advising employees that it was establishing a credit union for them. Missirian reported, apparently mistakenly, that Freedom Federal Savings was somehow involved in the Company's plan to start a credit union. Upon hearing this news, Keosaian felt that he had been deceived by Star Market officials. In his words, Keosaian felt that "they're giving me a little pat job on the head until they can get all their posters out and get the whole system set up, and then they're going to talk to me afterwards, a week later."

On Saturday, March 25, Keosaian discussed the matter with an official of the National Credit Union Administration, who advised him that banks could not operate credit unions.[1] On Monday, March 27, Keosaian called Freedom Federal Savings and was eventually put in touch with Richard Perry, an attorney for the bank, with whom he spoke on several occasions that day. Calling himself an attorney for the proposed Star Market employees credit union, Keosaian informed Mr. Perry that Star Market had distributed a notice announcing its plans to establish a credit union and that Freedom Federal was somehow tied in with the plan. Keosaian told Perry that if the notice contained misrepresentations regarding the role of Freedom Federal, he would take legal action to enjoin publication of the notice. Keosaian also made reference to a "suit for interference with advantageous relationships." Perry said he was

---

1. Under the Federal Credit Union Act, 12 U.S.C. § 1751 *et seq.*, a federal credit union may be organized only by natural persons, not corporations, 12 U.S.C. § 1753; and it must be managed by a Board of Directors elected by its members, 12 U.S.C. § 1761.

unaware of the notice and the two agreed to attempt to locate it to see if it contained misrepresentations.

Keosaian's phone calls led Perry to report the matter to the General Counsel of Freedom Federal, who in turn telephoned the Chairman of the Board of Star Market at home in the evening. The Chairman reported the matter to one of his vice presidents, a Jack Avedisian, who then called a meeting of Star Market officials. According to Ms. Nicholson's testimony, Avedisian arrived at the meeting "visibly upset." It was then that the decision was made to terminate Keosaian.

On Friday, March 31, Keosaian's store manager sent him to a meeting with Star Market's regional personnel manager and operations manager. These two men informed Keosaian that a decision had been made to terminate his employment because of his telephone calls to Freedom Federal. After a heated discussion, Keosaian left the office and returned to the Dorchester store, from which he was later ejected by three policemen.

On April 3, 1978, Keosaian filed a charge against Star Market with the National Labor Relations Board. Keosaian charged that the Company had discharged him because of his efforts to establish a credit union for Star Market employees, which efforts he argued were concerted activity for the "mutual aid or protection" of employees, and therefore protected under section 7 of the National Labor Relations Act. The General Counsel of the NLRB adopted Keosaian's theory of section 7 and issued a complaint against Star Market on May 15, 1978. Star Market responded by asserting that it had discharged Keosaian not because of his activity in attempting to establish a credit union, but because of "deliberate misconduct" in telephoning Freedom Federal Savings, conveying to the bank an alleged plan by Star Market to establish a credit union, and thereby embarrassing Star Market and jeopardizing its business relationship with Freedom Federal Savings.

The ALJ concluded, after the hearing, that Star Market had discharged Keosaian not, as the Company asserted, because of his telephone calls to Freedom Federal savings but, more generally, because of his efforts to establish a credit union. The ALJ found, however, that the Company would not have been involved in the proposed credit union except as the source of wages which some employees might contribute to it, and distinguished an early Board precedent, *G. & W. Electric Specialty Co.*, 154 NLRB 1136, *enforcement denied, sub nom. G. & W. Electric Specialty Co. v. NLRB*, 360 F.2d 873 (7th Cir. 1966). Because Keosaian's efforts to organize a credit union were unrelated to the employment relationship, the ALJ determined that these were not protected by section 7.

While we affirm the Board's decision to dismiss the complaint, we do so on the ground originally advanced by the Company. We find no substantial evidence to show that Star Market discharged Keosaian for any reason except his telephone calls to Freedom Federal Savings and its counsel. These calls, we think it clear, were not themselves protected activity, and hence constituted a permissible ground for discharge. We thus need not, and do not, go on to consider to what extent less objectionable conduct in furtherance of a credit union would have been protected under section 7.

It is firmly established that an employee's conduct may be so offensive, disruptive, or destructive of the employer's business as to go beyond the protection of section 7, even if the goals of the conduct are within the protection of section 7. *NLRB v. Local No. 1229, International Brotherhood of Electrical Workers* (Jefferson Standard Broadcasting Co.), 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953); *see also Trustees of Boston University v. NLRB*, 548 F.2d 391 (1st Cir. 1977); *Hochstadt v. Worcester Foundation*, 545 F.2d 222 (1st Cir. 1976); *NLRB v. Circle Bindery, Inc.*, 536 F.2d 447 (1st Cir. 1976). The exact location of the dividing line between protected and excessive activity is sometimes difficult to discern, but there is no need to locate that line precisely for purposes of

this case. Keosaian's conduct in unilaterally telephoning his employer's bank, representing himself as the attorney for the proposed credit union,[2] telling the bank's attorney that his employer had engaged in misrepresentations, and threatening legal action—all without prior discussion or attempted clarification with his own employer—went well beyond the boundary of protected activity, even if less offensive conduct in furtherance of a credit union would have been protected under section 7.[3]

■ Since it is undisputed that Keosaian did engage in this excessive behavior, the Board could find a section 8(a)(1) violation in his discharge only if it found that the discharge was primarily motivated by Keosaian's other, more moderate and arguably protected actions in furtherance of a credit union.

The ALJ and Board never identified the particular actions by Keosaian which they felt had led to his firing. They simply found, broadly, that he was fired for seeking to establish a credit union. If the ALJ meant to imply that the firing was motivated by actions in behalf of a credit union other than the telephone calls, we think the record does not support the conclusion. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We find no plausible evidence that Star Market would have fired Keosaian merely for advocacy of a credit union or for reasonable organizational efforts on behalf of forming an in-house credit union. Far from the record containing evidence of any hostility on Star's part to the idea of a credit union among its employees, Star Market officials testified that, by the time of Keosaian's discharge, the Company had perceived the interest of employees in a credit union, it had conducted a study of the proposal, and

its Directors had approved the idea. This testimony is corroborated by the fact that since the time of Keosaian's discharge the Company has arranged for its employees to join an existing credit union. There is no evidence to the contrary.

Nor does the record include any suggestion that the Company was hostile to Keosaian's efforts to discuss the idea of a credit union with fellow employees. Keosaian testified that he attempted on several occasions to contact the Company's President about the establishment of a credit union, and that the President never responded to his letter or calls. However, Keosaian did receive a response from a vice president of the Company, to whom the matter of a credit union had been delegated. Ms. Nicholson arranged to meet with Keosaian to discuss the proposal, and there is no evidence that, at the time, she did not intend to do so, nor is there any suggestion that the Company resented Keosaian's efforts to contact its President.

It is true that while Keosaian was trying to establish a credit union under his own leadership, the Company was apparently promoting a plan of its own, in response to employee requests, to bring an outside credit union into Star Market. But up to the time of Keosaian's hostile telephone calls to Freedom Federal Savings, none of his activities had elicited any adverse response from Company officials. It was the phone calls, according to uncontested testimony from Ms. Nicholson and another Star Market official which caused an intensely volatile reaction from Star's top brass. It takes little imagination to understand how Star Market officials might be annoyed at an employee who, representing himself as an attorney for an incipient credit union, was threatening to sue both Star and its bank, on the

---

2. Asked who appointed him as attorney, Keosaian testified, "Me . . . . No one else."

3. The Board did not express a contrary view. Rather it simply found that Keosaian was fired for his overall conduct in seeking to establish a credit union (which would have included, but was not limited to, the phone calls), and determined that the entire range of conduct was, on the facts of this case, unprotected by section 7.

While we do not pass on the question, we think it doubtful that appropriate employee action in furtherance of establishing a credit union—such as circulating a petition, seeking employer cooperation, etc., would not be protected under section 7. *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 567 n.17, 98 S.Ct. 2505, 2513, 57 L.Ed.2d 438 (1978).

basis of a seemingly unfounded charge of misrepresentation. Ms. Nicholson testified that Star officials, embarrassed in their relations with Freedom Federal, upon which they relied to serve various banking needs, were worried about possible repercussions in future business relations with the bank. Be that as it may, Keosaian's phone calls resulted in a hastily convened meeting of Star's top management. However the ALJ might personally have responded to Keosaian's conduct, the employer was entitled to find it intolerable.[4]

*The petition for review is denied.*

---

4. In *NLRB v. Eastern Smelting,* 598 F.2d 666 (1st Cir. 1979), we held that the burden is on the Board to show that the discharge resulted from the improper motive alleged, and that except in clear cases, "the mere fact that the Board considers the asserted good reason less than compelling will not suffice . . . ." *Id.,* at 671. We noted further that the Board is not to set up its own business standards and then condemn the employer for not following them. *See also NLRB v. Wilson Freight Co.,* 604 F.2d 712 (1st Cir. 1979), *cert. denied, Smith v. Wilson Freight Co.,* 445 U.S. 962, 100 S.Ct. 1650, 64 L.Ed.2d 238 (1980); *NLRB v. Eastern Smelting & Refining,* 598 F.2d 666 (1st Cir. 1979); *Liberty Mutual Insurance Co. v. NLRB,* 592 F.2d 595 (1st Cir. 1979); *NLRB v. Rich's of Plymouth,* 578 F.2d 880 (1st Cir. 1978).