## TEXAS INSTRUMENTS INCORPORATED, Petitioner,

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 80–1120.

United States Court of Appeals, First Circuit.

Argued Sept. 5, 1980.

Decided Jan. 7, 1981.

---

824

Wayne S. Bishop, Washington, D. C., with whom Adin C. Goldberg, and Seyfarth, Shaw, Fairweather & Geraldson, Washington, D. C., were on brief, for petitioner.

Jerrold J. Wohlgemuth, Atty., Washington, D. C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and John G. Elligers, Atty., Washington, D. C., were on brief, for respondent.

Before CAMPBELL and BOWNES, Circuit Judges, and KEETON,* District Judge.

* Of the District of Massachusetts, sitting by designation.

LEVIN H. CAMPBELL, Circuit Judge.

In *Texas Instruments, Inc. v. NLRB*, 599 F.2d 1067 (1st Cir. 1979), we vacated and remanded that part of a decision of the National Labor Relations Board (Board) finding that Texas Instruments, Inc. (TI) violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3) (1976), when it discharged six employees for disseminating information classified by the company as confidential. *See Texas Instruments, Inc.*, 236 NLRB 68 (1978). Subsequent to our remand the Board issued a Supplemental Decision and Order affirming its earlier order in the case. 247 NLRB No. 37 (Jan. 15, 1980). TI now petitions for review and reversal of the Supplemental Decision and Order, and the Board cross-petitions for enforcement.

### I

The facts in the case are set out in our earlier opinion, 599 F.2d at 1069–70, but we partially restate them here in the interest of clarity.

The six employees whose termination triggered this litigation worked at Texas Instruments' plant in Attleboro, Massachusetts and belonged to a small group called the Union Organizing Committee. As members of the Committee, they sought to elicit support for unionization of the Attleboro plant by occasionally distributing union leaflets at the plant gates and by generally showing their support for the union. Prior to the present incident, the six employees had received satisfactory or good performance ratings and at least one was promoted. In May 1977, however, they ran afoul of TI's company security policy, which as applied in the present context is challenged as invalid.

As a major manufacturer of sophisticated electronic products which deals extensively with the Department of Defense, TI

> "has had, since 1960, a well developed internal security system, to deal adequately with defense security demands, to protect itself against those who would seek highly valued technological product

and process information, and to safeguard certain managerial information including 'competitive or business intelligence'. There are two levels of classification: 'TI Strictly Private' and 'TI Internal Data'. The former is the more sensitive and is applied to all 'important TI information or material of a proprietary nature, the unauthorized use or disclosure of which could seriously impair the interests of TI'."

599 F.2d at 1069.

TI effectuates its classification program in part by means of a rule requiring immediate discharge for deliberate disclosure of "strictly private" material to unauthorized persons. *See* 599 F.2d at 1072; 247 NLRB No. 37, *supra*, slip op. at 4–5. A company handbook given to each employee lists "disclosure of classified or proprietary material to unauthorized persons" among the "major infractions [which] may be considered grounds for termination." TI's Personnel Manual provides that if such a security violation "was deliberate and resulted in compromise of information, immediate termination will result." The mandatory nature of the penalty for deliberate disclosure of classified information is borne out in practice. Testimony by company witnesses indicated that wilful (as contrasted with negligent) commission of a major infraction has regularly led to termination. In its Supplemental Decision, the Board found that "[d]uring the approximately 20 years that this security system has been in effect, [TI] has consistently applied this sanction [i.e., termination] in the five cases where it had been proven that such classified information was revealed." 247 N.L.R.B. No. 37, *supra*, at 5.

TI employees are generally apprised of this policy through the company handbook and staff and department meetings. In addition, the treatment of confidential information was apparently a frequent topic in a monthly company newspaper circulated among employees at the Attleboro plant.

Of present concern is the application of this security rule to certain wage informa-

tion gathered and analyzed by TI. As a matter of corporate policy, TI seeks to make wages and benefits at each of its plants competitive with other employers in the area. To implement this policy the company conducts an annual area wage survey which solicits information from both union and nonunion employers about the number of persons they employ in specific job categories and their minimum, maximum and average rates of pay for each category. In seeking the cooperation of other employers, TI advises them that "all data will be treated with strict confidence."

TI compiles the wage information it receives into two reports. One report is distributed to the companies participating in the survey. It lists the average rate of pay for each job category at each company and identifies the companies only by code letters, thus ensuring the anonymity of the data. The other report is far more detailed and circulation of the few copies produced is restricted to a small number of high level TI management personnel.[1] It comprises roughly fifty separate "wage recommendation sheets," one for each job category, that show the number, as well as the minimum, maximum and average wage, of employees in that category at each company. The companies are identified by name and arranged on the sheets according to pay scale, with the highest-paying company listed first. Arrows in the right-hand margin of each sheet indicate TI's rank in the survey, the compensation staff's recommended wage increase for that job category and where the proposed increase would place TI in relation to the other companies. Counsel for TI stated in oral argument that the second report also contains information about company profitability, recent wage increases and the reevaluation of jobs, but this is not apparent from the record. This more extensive report is used by TI's top management to determine the company's wage schedule and has always been classified "TI Strictly Private"; indeed, every page of the report is stamped with this classification.

Sometime prior to May 25, 1977, a copy of the most recent version of this second, highly confidential wage survey report

"was anonymously mailed to the Organizing Committee's post office box. Members of the Committee were never implicated in the mailing. After receipt of the papers, members of the Committee discussed the information; realized that it would be helpful in their attempts to unionize the company, inasmuch as organized plants were shown to be paying higher rates; and cut off the 'Strictly Private' label, reduced and reproduced in a leaflet two comparative tables of wages, one comparing rates for a grade 2–3 bench-worker at TI and sixteen other named plants and the other comparing rates for a grade 10 toolmaker at TI and 15 other named plants. Narrative material pointed to the moral:

'The key thing for setting the wages in this area is what the union shops are doing. Take G.E., for example, doing the same work we're doing but making well over $1.00 more an hour, because workers there have struggled over the years through their union for a decent wage. If it wasn't for these organized places paying better wages to bring the average up, we'd be down there with Balfours.' "

599 F.2d at 1070.

The leaflets were first distributed on May 25, 1977 at 6:30 a. m. TI management personnel soon discovered that the material contained reproductions of two wage recommendation sheets. Augat and Balfours, two companies at or near the bottom of the wage survey tables, also became aware of the contents of the leaflet (the source of their information is not specified) and called TI on May 25 to express concern. The leafletting continued at 3:30 p. m.

"and management representatives contacted four of the distributors, informing them that the leaflet contained 'Strictly Private' matter and warning them that

---

1. The ALJ, in his initial disposition of the case, indicated that only 16 copies existed apart from the one received by the Union Organizing Committee. 236 NLRB at 70.

continued distribution would subject them to summary termination. They and others met in the evening. One of them testified, 'We discussed it and our decision was that if the company did have any rights in the matter, had any claim on the material or anything of that sort; then they would have confiscated the leaflet right on the spot or taken some kind of measures against us. And, since that hadn't happened, we decided to go out again the next day.' "

599 F.2d at 1070.

On the next morning, May 26, the leaflets were again distributed, notwithstanding renewed warnings. Later in the day

"the six people who had been distributing the leaflets were interviewed and then suspended. Five days later TI concluded that evidence was lacking to implicate the employees in the original leak of the data, but that the six employees had wilfully disseminated classified materials and that company policy required immediate termination."

599 F.2d at 1070. The employees were suspended on May 26, and then terminated several days later. This unfair labor practice proceeding was subsequently initiated.

## II

The original disposition of the case by the administrative law judge (ALJ) and the Board is described in our previous opinion. See 599 F.2d at 1070–71. In remanding to the Board, we indicated that further proceedings were to focus "on the issues of the validity of the rule invoked by the company to justify the discharges, just as . . . in *Jeanette Corp. v. NLRB*, 532 F.2d 916 (3d Cir. 1976)." 599 F.2d at 1073. If the rule were found invalid under section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1976), then discharges pursuant to the rule would necessarily be violations of section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) (1976).

"This is so because the employer's asserted motivation—i.e., enforcement of a rule—must be in support of a rule not prohibited by labor law. If it is not it could not support a discharge even if the motivation to enforce the rule, a neutral not an anti-union objective, were the employer's only motivation for that discharge."

599 F.2d at 1072 (footnote omitted). See *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 805, 65 S.Ct. 982, 988, 89 L.Ed. 1372 (1945). We went on to state, however, that if the rule were found valid, then "the Board would face the task of assessing motive" in order to decide the propriety of the discharges. 599 F.2d at 1073. See Part IV, *infra*.

The *Jeanette* case cited in our previous opinion identifies three stages in assessing the validity of a company rule. Initially the NLRB carries the burden of establishing that the employer's conduct pursuant to a company rule could have adversely affected employee rights protected under section 7 of the NLRA, 29 U.S.C. § 157 (1976). Such a showing is sufficient to render the rule "prima facie violative of section 8(a)(1)" and the burden in the second part of the inquiry "falls on the employer to demonstrate 'legitimate and substantial business justifications' for his conduct." 532 F.2d at 918. Finally, if such justifications are forthcoming, the Board must " 'strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.' " 532 F.2d at 918, *quoting NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614 (1967) and *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33–34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967). The test laid out in *Jeanette* is for the most part based upon an approach developed by the Supreme Court in the *Fleetwood Trailer* and the *Great Dane Trailers* cases, *supra*.[2]

---

**2.** In *Great Dane Trailers* the Supreme Court described two possible permutations of this analysis. First, where employer conduct is " 'inherently destructive' of important employ-

ee rights," the Board can find an unfair labor practice "even if the employer introduces evidence that the conduct was motivated by business considerations." 388 U.S. at 34, 87 S.Ct.

In a Supplemental Decision and Order issued following our remand the Board structured its reasoning to conform to the analysis in *Jeanette*. The Board first turned to the question whether "the employees, while leafleting [sic], were engaged in protected concerted activity." Determining that they were, the Board said,

"It is clear that the employees, by engaging in such activity were encouraging collective action to improve wages. This is evident from the wording of the leaflet, set out above, which indicates that the objective of the members of the Committee in disclosing the confidential wage data was to enforce their argument that only by means of a union could higher wages be assured. The wage information involved herein . . . [is] the type of data necessary to employees for making an informed decision about unionization."

247 NLRB No. 37, *supra*, slip op. at 8–9. Next, the Board reviewed the business justifications proffered by TI for its rule prohibiting disclosure of confidential information. It noted at the outset that

"This is not a case of lack of evidence tending to justify the rule . . . . On the contrary, because of the highly technical and defense-related material it handles, [TI] has in general shown that it has serious security interests which it justifiably is seeking to protect. In view of these genuine security needs, and the fact that there is no evidence or claim that the rule was unlawfully promulgated, [TI's] rule, on its face, appears to be valid."

*Id.*, at 9. The Board therefore went on to examine TI's specific justifications for applying its rule to the particular conduct at issue in this case.

TI argued that the wage recommendation report obtained by the Committee was properly treated as confidential, and its dis-semination was an adequate ground for discharging the employees, because TI had assured companies participating in the area wage survey that the information they provided would be kept confidential. The Board held that an unsolicited assurance of confidentiality "does not automatically cloak [the wage survey data] with such status" and found "little evidence that the breach of [TI's] pledge by its employees resulted in damage to TI's reputation . . . ." *Id.*, at 10.

TI also asserted that disclosure of the information in the wage recommendation report could result in competitive harm to the participants in the survey, including itself. In the first proceeding before the Board in this case the company offered this argument in justification of both the rule presently in question and a rule barring employees from divulging TI's own wage schedules to outsiders. As the Board pointed out in its Supplemental Decision, our earlier opinion upheld its initial determination that the latter rule was invalid since "TI, in mounting its annual wage survey, gives out its own wage data to every one of its competitors within a 25 mile radius." 599 F.2d at 1073–74. Based on that portion of our previous holding in the case and the finding of the Board upon remand that "it would be difficult for any competitor to utilize the limited information divulged by the handout to TI's disadvantage," the Board rejected this second business justification. *Id.*, at 11.

Finally, TI argued that the wage recommendation reports were properly treated as confidential due to their important role in management's formulation of TI's own wage schedule. The Board held that

"this type of information (area wage surveys), is not automatically entitled to be withheld as confidential documents, espe-

---

at 1797. This case does not involve such a situation. *See* 599 F.2d at 1072 n.5. Second, "if the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight,' an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the con-duct." *Id.* Implicit in the discussion of these two situations is the existence of a third possibility: employer conduct that affects no employee rights. The Board in the present suit treated the case as an example of the second situation; as will be explained in Part III, *infra*, we feel the case is correctly decided as an instance of the third situation.

cially when [TI] relies on them to determine its own wage rates. Moreover, TI itself breached the integrity of that alleged confidentiality by releasing similar information to its participating employers, and in selectively disclosing to its employees portions of its survey to support its position of a competitive wage scale."

*Id.*, at 12.

Having found the discharged employees' conduct to be an exercise of rights protected by section 7 of the NLRA, and having rejected TI's justifications for terminating the employees pursuant to its pertinent security rule, the Board concluded that "the analysis undertaken herein requires striking the balance in favor of the employees in exercising their Section 7 rights as opposed to the interest of the employer in enforcing its rule." *Id.* The rule as applied in this case was thus declared invalid, and the Board found it unnecessary to determine whether some other even more egregious motive caused the discharges.

### III

■ We disagree with the Board's conclusion that TI was prohibited, as a matter of law, from enforcing its security rule with respect to conduct such as occurred here, *i. e.*, its employees' deliberate [3] disclosure of confidential wage survey material, gathered for management purposes and marked "strictly private," that had come to the employees' attention irregularly, outside proper channels. Contrary to the Board's

ruling, we do not believe the employees' conduct as described was activity protected by the NLRA. It follows that TI's rule prohibiting deliberate disclosure of confidential company information, which the Board correctly held to be valid on its face, could be validly applied on these facts to prohibit and penalize dissemination of the information in question.

■ Conduct falls within the protection of the NLRA if it involves the exercise of a right guaranteed to employees by section 7 of the Act, 29 U.S.C. § 157. *See Fleetwood Trailer Co., supra,* 389 U.S. at 378, 88 S.Ct. at 545; *Great Dane Trailers, supra,* 388 U.S. at 34, 87 S.Ct. at 1797; 29 U.S.C. § 158(a)(1). In its Supplemental Decision and in its brief to this court, the Board contends that the employees' dissemination of TI's confidential company information was an exercise of their right to exchange information about the benefits and drawbacks of self-organization and accordingly was protected under the NLRA. While it is true that the Supreme Court has recognized a right in employees to exchange organizational information as a necessary incident to "the right to self-organization" expressly guaranteed by section 7, *see NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 113, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956); *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945), it is also true that an abstract invocation of this right does not automatically shield an employee's acts from sanction un-

---

**3.** The Board has not argued that the employees' conduct here was other than deliberate and knowing. In its Supplemental Decision the Board describes the employees as having, "while engaged in organizational leafleting [sic], knowingly distributed material which contained classified wage survey information . . . ." 247 NLRB No. 37, *supra,* slip op. at 1. The record shows that the anonymously mailed wage survey, each page of which was stamped "strictly private," was in the possession of the small Organizing Committee, to which the dischargees belonged, for approximately a month before it was used. All six employees were stipulated to have participated in one or more meetings at which the material was discussed and a decision made to incorporate it in an organizational pamphlet. Company witnesses

testified that all six employees admitted, prior to discharge, that they knew the material was classified. All six employees had received TI's booklet, listing the rule against distribution of classified material and stating that violation thereof was a "major infraction" which may be considered grounds for termination." It was stipulated that five of the six discharged employees were present on May 25 at a meeting after the leafletting had commenced during which it was discussed that TI's officers had warned that the information was classified and the distributors' actions could result in discharge. Notwithstanding these warnings, the employees decided to continue to distribute the material, and leafletting proceeded the next day with all but one of the six, James Mallen, participating.

der a company rule. Not all conduct that can, in some general sense, be characterized as an exercise of a right enumerated in section 7 is afforded the protection of the Act. *See NLRB v. Local 1229, IBEW,* 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953); *Keosaian v. NLRB,* 630 F.2d 36, 38–39 (1st Cir. 1980); R. Gorman, *Labor Law* 296–317 (1976). For example, concerted activity that violates state or federal law, that irresponsibly exposes an employer's property to possible damage or that constitutes insubordination or disloyalty may be found to fall outside the scope of the NLRA even if undertaken in the interest of self-organization or collective bargaining. *See* R. Gorman, *supra,* at 311–17. We do not mention these examples as an exhaustive delineation of the contours of section 7, nor in order to capture the unique circumstances of the present case, but simply to suggest the proper approach to defining employee rights under the Act: rights under section 7 must in each instance be understood in relation to the concrete facts of a particular case. *See Fleetwood Trailer Co., supra,* 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614; *Great Dane Trailers, supra,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027; *Keosaian, supra,* 630 F.2d at 38–39; *NLRB v. Knuth Brothers, Inc.,* 537 F.2d 950, 953–57 (7th Cir. 1976). It is not enough to decide, as did the Board, that the discharged employees had a right to disseminate information in furtherance of their organizational goals; it must also be asked whether they had a right to distribute *this* information. Based on a variety of factors drawn from precedents of

the courts as well as the Board, we find they did not.

■ As an initial consideration, the discharged employees would have had no right in the present context to have insisted upon receiving access to TI's wage recommendation reports.[4] This point was conceded by counsel for the Board in oral argument and is well established in case law. *See Decaturville Sportswear Co. v. NLRB,* 406 F.2d 886, 889–90 (6th Cir. 1969); *NLRB v. Clearwater Finishing Co.,* 203 F.2d 938 (4th Cir. 1953); *Southern & Western Lumber Co.,* 212 NLRB 668 (1974); *cf. Vitrionic, Inc.,* 183 NLRB 1067, 1077–78 (1970) (seeking information from employer to assist consumer boycott against it); *Montgomery Ward & Co.,* 146 NLRB 76 (1964) (seeking information related to employee grievance). Indeed, other cases go farther and indicate that the employees, once having stumbled across TI's confidential data, would have had no right knowingly to *use* the classified wage survey information, gathered by management solely for its own internal use, in their organizing activities. In its opinion in *Ridgely Manufacturing Co.,* 207 NLRB 193, 196–97 (1973), the Board states as a "rule of thumb" the proposition "that employees are entitled to use for self-organizational purposes information and knowledge which comes to their attention in the normal course of work activity and association but are not entitled to their Employer's private or confidential records." *Accord NLRB v. Florida Steel Corp.,* 544 F.2d 896, 897 (5th Cir. 1977); *Bell Federal Savings & Loan Association,* 214 NLRB 75, 78 (1974).[5] It

---

4. This is not a case involving the right of a bargaining representative to request information needed for the proper performance of its duties in negotiating, administering or policing a contract. *See Detroit Edison Co. v. NLRB,* 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979); *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 435–36, 87 S.Ct. 565, 567–68, 17 L.Ed.2d 495 (1967); *Western Mass. Elec. Co. v. NLRB,* 589 F.2d 42, 46 (1st Cir. 1978). An employer's duty to furnish information to his employees as defined in cases of this nature derives from the statutory duty to bargain. TI being nonunion, the duty to bargain is not implicated here.

5. *Bell Federal Savings* can be read to define employee rights more narrowly than *Ridgely.* In *Bell,* the Board held that a switchboard operator's disclosure to a union official of the number of calls received by the company president from his attorney was not protected activity. The Board distinguished her action from the conduct of employees who use information obtained in the course of their work apparently on the fact that the information about the president's calls, though obviously gathered in her normal duties, was not "openly available" to employees in general. 214 NLRB at 78. The Board also noted that her conduct was "a breach of trust justifying discipline" and that the union could have obtained directly the

seems clear that the TI wage recommendation sheets anonymously mailed to the Union Organizing Committee came to the attention of the discharged employees outside the normal course of their employment.

▮ A second factor to be considered is the confidential nature of the information in the wage survey report. This is not a case involving information gathered by the employees themselves; information already effectively released by the company; or information so generally known in the outside world as to be beyond protection,[6] see News-Texan, Inc. v. NLRB, 422 F.2d 381, 386 (5th Cir. 1970); Southern & Western Lumber Co., supra, 212 NLRB at 669; in which the information was readily accessible to employees, see Southern & Western Lumber Co., supra, 212 NLRB at 669; Ridgely Manufacturing Co., supra, 207 NLRB at 197; or in which nothing in the nature of the information suggested its confidentiality, see Southern & Western Lumber Co., supra, 212 NLRB at 669. See generally note 3, supra. The data had been compiled through the efforts of TI's officials entirely for limited executive use. Certain of it, consisting of evaluations and wage recommendations by TI's staff, was internal to TI itself. The rest, while gathered from outside firms, had been specially compiled. TI clearly had a proprietary interest in its wage survey report. There was evidence that it cost TI around $10,000 to prepare the report, and that no similar compilation existed elsewhere. While TI's employees would certainly have had a right to disseminate any bits of the outside wage data they had obtained from outside sources, they had no right to appropriate their employer's confidential work product.[7] Each page of the company's report from which the discharged employees excerpted data for their leaflet was stamped "Strictly Private." And TI's employee manual and newspaper described TI's rule against disclosure of confidential information and the security system. In comparable situations, courts and the Board have held employees' use of confidential company information to be outside the protection of the NLRA. See Florida Steel Corp., supra, 544 F.2d 896; Clearwater Finishing Co., supra, 203 F.2d 938; Vitrionic, Inc., supra, 183 NLRB at 1078–79.

As a final consideration, we note the absence of evidence, even assuming this would be relevant, that the employees' organizing activities were somehow peculiarly dependent upon having access to the confidential information. Cf. NLRB v. J. P. Stevens & Co., 563 F.2d 8, 24–25 (2d Cir. 1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978) (refusing to order company to disclose wage rates, job descriptions, and dates for hire for employees in context of organizing campaign and in ab-

name of the company's bargaining representative. These factors are discussed infra.

6. The Board found that "TI itself breached the integrity of that alleged confidentially by releasing similar information to its participating employers, and in selectively disclosing to its employees portions of its survey to support its position of a competitive wage scale." This is an overstatement. The information disclosed to other employers pertained to wages, see 599 F.2d at 1073–74, but was anonymous and not detailed. See Part I, supra. Further, testimony by two TI employees would have supported a finding that, on one occasion in January 1977, a single page was posted on a company bulletin board disclosing the pay scale for certain job classifications of six or seven of the participants in the area wage survey. It is not clear whether this emanated from a company source. The record thus does not indicate that TI at any time abrogated the confidential status of the

detailed wage survey report it retained for internal use. In Florida Steel Corp., supra, 544 F.2d 896, partial and restricted release of confidential information did not make similar, but undisclosed information nonconfidential. 544 F.2d at 897–98 & n.3. We believe the same to be true in this case.

7. Mary Clinker, one of the discharged employees, testified that in an interview with TI management personnel prior to her discharge she challenged TI's concern with the disclosure of the wage material, claiming that she could have obtained the same information simply by calling friends employed at the companies participating in the wage survey. One of the interviewers, she stated, said in response, "[w]hen [she] called up and found out how much they were making, then [she] could go ahead and print it; but they had done the calling so [she] didn't have any right to print what they had done."

sence of a showing "that the employees' ability to learn the advantages of self-organization is in any way dependent upon the union's access to such ... information"). *Accord Textile Workers Union v. NLRB*, 388 F.2d 896, 906 (2d Cir. 1967), *cert. denied*, 393 U.S. 836, 89 S.Ct. 112, 21 L.Ed.2d 107 (1968). Though upon remand the Board found in the record no proof "that other means were 'readily available' to the employees here to acquire the same or similar data," it also pointed to no evidence suggesting that without the confidential TI information, the employees' organizing efforts would have been stymied. Reflective of the lack of dependency of the employees' organizing activities upon this material is the absence of any prior request therefor addressed to management. It may be true, as the Board argues, that "the distribution of leaflets setting forth the benchmark employers' wage rates and union status was ... directly relevant to the Company employees' organizing campaign," but the conclusion does not follow, as the Board would have us decide, that disclosure of this particular compilation, put together by TI's management for its own purposes and secured from other firms upon promises of confidentiality, was therefore the exercise of an employee right and so "a most basic form of protected concerted activity." As we have already observed, *supra*, not every activity in furtherance of self-organization is protected under section 7 of the NLRA. Even were we to assume—and we do not so hold—that the need for proprietary information might in pressing circumstances support a right on behalf of organizing employees to use that information, the facts of this case do not reveal any such circumstances.

■ To support finding an employee right in the present case that would trigger the protection of the NLRA, the Board argues that the discharged employees did not steal or misappropriate TI's confidential information. The presence or absence of

subreption and misappropriation is certainly a significant factor in deciding whether employee conduct is a protected exercise of a section 7 right. *Compare News-Texan, Inc., supra*, 422 F.2d at 386, *and Southern & Western Lumber Co., supra*, 212 NLRB at 669, *with Florida Steel Corp., supra*, 544 F.2d at 897–98, *and Clearwater Finishing Co., supra*, 203 F.2d at 939, *and Vitrionic, Inc., supra*, 183 NLRB at 1078. However, this factor by itself is, at most, one element among many. Furthermore, the conduct at issue was by no means wholly innocent. The manner in which the employees received TI's wage survey report certainly suggested that the anonymous sender had obtained it through questionable means or was circulating it in breach of confidence. Nevertheless, they reproduced parts of the report in their organizing leaflet, being careful to cut from each page that they used the label "Strictly Private." [8]

■ Finally, the Board claims that disclosure of the confidential material "did not threaten any commercial harm to the Company." Such a consideration would be more appropriate to an inquiry into the employer's business justifications for its termination of the employees—a portion of the *Jeanette* inquiry which for present purposes we do not reach, *see infra*. Even, however, if commercial harm were relevant to the existence of an employee right under section 7, *see Knuth Brothers, Inc., supra*, 537 F.2d 950; *News-Texan, Inc., supra*, 422 F.2d 381; *Vitrionic, Inc., supra*, 183 NLRB 1067, its presence or absence would be but one factor; mere absence of resulting harm would not by itself demonstrate that the activity was protected.

Our examination reveals no basis sufficient to support a finding that the discharged employees' unauthorized and knowing use, in an organizing leaflet, of a confidential wage survey prepared by TI management for its own purposes, was the exer-

---

**8.** In oral argument counsel for the Board claimed that this was necessary to fit the sheets onto the leaflet. An examination of the layout of the leaflet and the proximity on the wage sheets of the classification labels to the material reproduced in the leaflet would suggest that this was not the case.

cise of a right guaranteed by section 7 of the NLRA. As the employees' conduct was therefore not "protected activity," we need not go on to the other *Jeanette* criteria. That is, we need not review the Board's balancing, in light of the Act and its policies, of TI's proffered justifications for application of the rule on these facts, against a supposed invasion of employee rights. No such invasion of employee rights existed. Applied to the materials and to the conduct in question, the company security rule was valid.

## IV

■ In our previous opinion, we stated that if upon remand the rule were found valid, the Board would still face the task of assessing motive, *i. e.*, of determining whether the discharges were, in fact, prompted by infringement of the valid rule or were instead prompted by an impermissible anti-union purpose. 599 F.2d at 1073. *See also NLRB v. Wilson Freight Co.*, 604 F.2d 712, 723 (1st Cir. 1979), *cert. denied*, 445 U.S. 962 (1980) 100 S.Ct. 1650, 64 L.Ed.2d 238. As on remand the Board decided that the rule was not valid, it never undertook an assessment of motive. Now, following our reversal of the Board, it must be asked if the rule, rather than an illegal anti-union purpose, was the true basis for discharge. This question requires consideration of another: should the issue of motive be remanded to the Board yet another time? We think not, on this record. We would conclude differently if there remained a genuine issue of fact to be decided. The record, however, discloses no substantial basis in fact on which the Board could reasonably reject TI's contention that the employees were discharged because of their violation of the confidentiality rule. Indeed, the Board has not argued for remand in the event its determination of invalidity is overturned; its arguments have been addressed solely to upholding that determination. In the circumstances, we believe the discharges must be held to be lawful.

■ In our previous decision, we mentioned two steps as being required in the analysis of an employer's motive.

"The first is the determination that a significant 'bad', or anti-union, motivation contributed to the discharges. The second is the subsequent weighing of the employer's defense that a 'good' reason for the discharge existed and would have produced the discharge even in the absence of the bad reason."

599 F.2d at 1073 (footnote omitted). On the first point, the record contains only the most marginal evidence of a "bad" motivation. TI was openly opposed to unionization of its plants, but that, without more, would not offend the NLRA, nor support a finding of anti-union motive. *See NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 670 (1st Cir. 1979); *Florida Steel Corp. v. NLRB*, 587 F.2d 735, 743–44 (5th Cir. 1979). While TI management personnel knew of the discharged employees' organizational activities, TI had given the employees good performance ratings, and had recently promoted one of them. There is no evidence of improper anti-union conduct, such as prior harassment of these or others on account of protected activities.

■ By contrast, there is persuasive evidence in the record that TI had a "good" reason for the discharges: the six employees had openly and knowingly violated a rule which not only prohibited disclosure of classified material but made such conduct a major infraction constituting grounds for discharge. The conduct of the employees in this case plainly fell within the purview of that rule. TI furnished considerable evidence of the seriousness with which it took its security program, and of its persistent efforts to enforce all aspects of it throughout its large organization. The record indicates that wage survey reports have for some time been treated as confidential by TI and that the one disseminated by the employees had its "strictly private" classification stamped on every page. Dissemination of the information was shown to be both knowing and deliberate. *See* note 3, *supra*. The rule, therefore, was clearly violated and under TI policy termination was the mandated penalty. This penalty is spelled out in company manuals and has been consistently pursued in fact. *See supra*. Without evidence of improper or in-

consistent application of what has been determined to be a valid company rule, we can see no basis on which a supported finding could be made that the six employees would not have been fired but for their union activities. *See Eastern Smelting, supra,* 598 F.2d at 671. *Compare First Data Resources, Inc.,* 241 NLRB No. 114, slip op. at 14–15 (1979). The Board's discussion in its Supplemental Decision as to the presumed lack of harm resulting from disclosure of the wage survey information, *see* Part II, *supra,* does not supply the necessary quantum of evidence. In assessing motive

"the factfinder is bound to weigh the employer's asserted justification with some delicacy and deference. 'It is important in cases involving business judgment that the Board not set up its own standard, and then conclude that, since the employer had another, it was ipso facto suspect.' *Eastern Smelting supra,* 598 F.2d at 673. The ALJ and the Board cannot dismiss an employer's justification entirely, as having no weight or substance at all. Rather there must be a weighing of the relative strengths of the good and bad motivations, not to determine how the Board would have behaved under similar circumstances but to determine what in fact motivated the employer."

599 F.2d at 1073. *See also Wilson Freight Co., supra,* 604 F.2d at 721–22; *Liberty Mutual Insurance Co. v. NLRB,* 592 F.2d 595, 603 (1st Cir. 1979); *Stone & Webster Engineering Corp. v. NLRB,* 536 F.2d 461, 467 (1st Cir. 1976) ("The Act was not intended to guarantee that business decisions be *sound,* only that they not be the product of antiunion motivation." (emphasis in original)). The breach of confidence at issue, whatever its ultimate effect in fact, is not patently trivial. TI had a legitimate interest in protecting the integrity of its security system and in preserving an image of reliability among companies with which it dealt. *Compare First Data Resources, supra,* 241 NLRB No. 114, slip op. at 14–15. In the final analysis, there would be no way to uphold the Board on this record without giving to the discharged employees a preference over other employees who would be bound by TI's rule and could not claim the benefit of having engaged in organizational activities. While the NLRA protects against retaliation on account of union activities, it does not license activists to violate valid company rules with impunity. "Union membership is no guaranty against discharge." *Schwob Manufacturing Co. v. NLRB,* 297 F.2d 864, 871 (5th Cir. 1962), quoted in *Florida Steel Corp., supra,* 587 F.2d at 743.

*The Board's petition for enforcement is denied and its Supplemental Decision and Order is set aside in whole.*